The JEWISH SEPHARDIC YELLOW PAGES, LTD., d/b/a Kosher Yellow Pages, Plaintiff,

v.

DAG MEDIA, INC. and Assaf Ran, Defendants.

DAG Media, Inc. and Assaf Ran, Third–Party Plaintiffs,

v.

David Ben Hooren, Third–Party Defendant.

The Jewish Sephardic Yellow Pages, Ltd. and David–Ben Hooren, Fourth–Party Plaintiffs,

v.

DAG–Jewish Directories, Inc., Fourth–Party Defendant.

No. 04–CV–747 (RJD).

United States District Court, E.D. New York.

March 19, 2007.

Cathy E. Shore–Sirotin, Myron Greenspan, Lackenbach Siegel LLP, Scardale, NY, for Plaintiff.

James Francis Baxley, Hart, Baxley, Daniels & Holton, Carl M. Bornstein, Law Office of Carl M. Bornstein, New York, NY, Mark F. Heinze, Ofeck & Heinze, LLP, Hackensack, NJ, for Defendant.

## MEMORANDUM & ORDER

DEARIE, Chief Judge.

Plaintiff The Jewish Sephardic Yellow Pages, Ltd. ("JSYP") sues defendants DAG Media, Inc. ("DAG") and its president and CEO Assaf Ran under the Lanham Act and New York state law for infringement of the unregistered trademark "Kosher Yellow Pages." Defendants now seek summary judgment on plaintiff's federal infringement claim, alleging that the mark is ineligible for trademark protection. The Court referred the motion to Magistrate Judge Roanne L. Mann for a Report and Recommendation pursuant to

28 U.S.C. § 636(b)(1)(B). On August 31, 2006, Magistrate Judge Mann concluded that the mark is ineligible for protection and recommended that defendants' motion be granted. On September 25, 2006, plaintiff filed objections to the Report. The Court has reviewed the record *de novo* and considered plaintiff's objections and defendants' responses. Plaintiff's objections are meritless.

In her Report, Magistrate Judge Mann concluded that the term Kosher Yellow Pages was descriptive rather than generic or suggestive. Magistrate Judge Mann went on to find that the mark is ineligible for trademark protection because plaintiff had not proved secondary meaning. Although the mark may be more appropriately classified as generic, the Court without hesitation joins Magistrate Judge Mann's well-supported conclusion that the mark, if deemed descriptive in character, has not acquired secondary meaning. Accordingly, the Court adopts Magistrate Judge Mann's recommendation that defendants' summary judgment motion should be granted.

## DISCUSSION

The material facts and procedural history are laid out in full in Magistrate Judge Mann's comprehensive Report.

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.

2000) (quoting *Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir.1991)). The Court's role in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although trademark disputes involve inherently factual determinations, the Second Circuit has indicated that summary judgment is as appropriate in trademark cases as in other cases where there are no triable issues of fact. *See, e.g., Bernard v. TBG Mktg. Co.*, 964 F.2d 1338, 1343 (2d Cir.1992) (affirming district court's grant of summary judgment in trademark case).

### B. Trademark Protection

Marks are classified in categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir.1992). The latter two categories are deemed "inherently distinctive" and are accorded protection on this basis alone. *Id.* Generic marks are never protected, whereas descriptive marks are eligible for protection only when they have acquired distinctiveness or "secondary meaning." *Id.*

The Court agrees with Magistrate Judge Mann's determination that the mark is not suggestive because it does not "require[ ] imagination, thought and perception to reach a conclusion as to the nature of goods." *Bernard*, 964 F.2d at 1341. Whether the mark is descriptive rather than generic is a much closer question. Generic terms "refer to the genus or class of which the product is a species," while descriptive terms "convey an immediate idea of some characteristic or attribute of the product." *PaperCutter, Inc. v. Fay's*

*Drug Co., Inc.,* 900 F.2d 558, 561–62 (2d Cir.1990). The Second Circuit has noted that the line between these two categories is "chimerical" and "often illusory." *See Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 213 n. 8, 215 (2d Cir.1985); *see also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:20, at 12–78 (4th ed.2006) (characterizing the boundary as "fuzzy and undefinable"). This line has proven especially elusive in the present case. As Judge Mann pointed out in her Report, plaintiff itself has used the Kosher Yellow Pages phrase in a generic sense. *See* Report and Recommendation at 363–65. At the same time, however, the composite term connotes more than one type of merchandise, and thus does not clearly "refer to the general class or category of the product" as is true of generic terms. *PaperCutter, Inc.,* 900 F.2d at 562. At this juncture, the Court need not definitively classify Kosher Yellow Pages as a descriptive rather than a generic mark since plaintiff's failure to establish secondary meaning renders the mark ineligible for protection regardless. *See Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.,* 198 F.3d 1143, 1150–52 & n. 5 (9th Cir.1999) (declining to classify mark as generic or descriptive where plaintiff failed to show secondary meaning); *Brandwynne v. Combe Int'l, Ltd.,* 74 F.Supp.2d 364, 382 (S.D.N.Y.1999) (classifying mark as generic in a close case but discussing plaintiffs failure to show secondary meaning as alternative ground for holding that the mark was not protected).

■ In determining whether a descriptive term has acquired secondary meaning, the Court looks to whether the term "comes through use to be uniquely associated with a single source." *PaperCutter, Inc.,* 900 F.2d at 564. The critical question is whether "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Bristol–Myers Squibb Co.,* 973 F.2d at 1041 (quoting *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns,* 830 F.2d 1217, 1221 (2d Cir.1987)). Secondary meaning is an inherently fact-bound determination entailing "vigorous evidentiary requirements," and the burden of proof rests on the party asserting exclusive rights in the mark— here, plaintiff JSYP. *Id.* at 1041 (quotations omitted). Moreover, the party asserting these rights must demonstrate that the mark acquired secondary meaning "before its competitor commenced use of the mark." *PaperCutter, Inc.,* 900 F.2d at 564.

■ Among the factors that courts have found relevant to the question of secondary meaning are: (1) advertising expenditures; (2) consumer studies; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *See Bristol–Myers Squibb Co.,* 973 F.2d at 1041. "In assessing the existence of secondary meaning, no single factor is determinative, and every element need not be proved." *Thompson Medical Co.,* 753 F.2d at 217 (quotation omitted). Although the Second Circuit has stated that district courts should be cautious in weighing these factors at the summary judgment stage, it has nonetheless supported summary judgment in cases where the proponent of the alleged trademark has failed to raise a material issue of fact on the question of secondary meaning. *See, e.g., Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.,* 65 F.3d 1063, 1071 (2d Cir. 1995) (affirming district court's grant of summary judgment in trade dress case where plaintiff "failed to raise a material issue of fact as to whether [its product] had acquired secondary meaning in the marketplace"); *Bernard,* 964 F.2d at 1343

(affirming district court's grant of summary judgment in trademark case where plaintiff "produced no evidence that a significant number of prospective purchasers associate his [ ] trademark with his product").

■ Based upon the submissions before the Court and considering the six factors outlined above, no reasonable jury could find that consumers had come to identify the term Kosher Yellow Pages with plaintiff by the time DAG began marketing its competing product in 2003.[1]

First, plaintiff claims that it has spent "in excess of tens of thousands of dollars annually" to advertise its mark. Ben–Hooren Decl. ¶ 54.[2] However, even after ample discovery, plaintiff has failed to show with any level of specificity the portion of this outlay that was devoted to its Kosher Yellow Pages mark. While plaintiff contends that it spent between $90,000 and $165,000 each year from 1999 to 2003 on telemarketing calls and over $320,000 in 1999 and 2000 on advertisements in newspapers, Ben–Hooren Supplemental Decl. ¶¶ 50–52, plaintiff has elsewhere admitted to presenting its Kosher Yellow Pages and Sephardic Yellow Pages directories to advertisers simultaneously. Ben–Hooren Decl. ¶ 16; Ben–Hooren Supplemental Decl. Ex. 17. Further, many of the marketing efforts undertaken by plaintiff—for example, the newspaper ads, billboards, door stickers, and promotional postcards—did not exclusively showcase the Kosher Yellow Pages mark. See Ben–Hooren Supplemental Decl. Exs. 16, 18, 22, 25. Rather, these materials display the Kosher Yellow Pages mark alongside and sometimes less prominently than JSYP's other identifying marks.[3] Several of plaintiff's purported promotional materials do not contain the Kosher Yellow Pages mark at all. See Ben–Hooren Supplemental Decl. Exs. 20, 23. Finally, plaintiff has not submitted any concrete evidence showing that these efforts succeeded in reaching the Jewish phonebook users who are plaintiff's target audience and who, along with advertisers, comprise the relevant segment of the public for purposes of assessing secondary meaning.[4] See Report and Recommendation at 42–44 (discussing relevant segment of the public). Thus, the Court is unable to conclude that plaintiff's advertising efforts have been effective in causing either advertisers or the consuming public to associate Kosher Yellow Pages only with plaintiff.

Second, plaintiff, by its own admission, has not conducted a consumer survey. Revised Pl.'s Supplemental Mem. Law at 4. Instead, plaintiff has submitted 14 identical affidavits from advertisers, all of whom claim they "automatically associate"

---

1. Though the parties dispute the date when DAG first began using the Kosher Yellow Pages mark, they have agreed, for purposes of this motion, that DAG has been publishing its Kosher Yellow Pages directory since at least 2003. Pl.'s Rule 56.1 Statement ¶ 21; Defs.' Mem. Law Supp. Mot. Summ. J. at 4.

2. Plaintiff's submissions variously spell Ben–Hooren's name with and without a hyphen.

3. These other marks include: "The Only Kosher Yellow Pages in the World!!" slogan; plaintiff's www.kosheryellow.com web address; plaintiff's Sephardic Yellow Pages directory; and the walking fingers logo typically associated with phone books.

4. In this regard, the Court takes special note of the fact that plaintiff did not provide annual distribution figures reflecting the number of consumers who received its Kosher Yellow Pages directory. Nor do plaintiff's statistics charting the growing number of website hits during the relevant time period confirm that a "tremendous portion of the population" was exposed to the mark because the hits could have come from a small number of frequent visitors. Ben–Hooren Supplemental Decl. ¶ 49.

the phrase Kosher Yellow Pages with plaintiff's directory. Ben–Hooren Decl. ¶ 34 & Ex. 12. While courts have stated that "consumer surveys are the 'most direct and persuasive evidence of secondary meaning,' " *Black & Decker Corp. v. Dunsford,* 944 F.Supp. 220, 227 n. 9 (S.D.N.Y. 1996) (quoting *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1333 n. 9 (8th Cir.1985)), the conclusory assertions in these boilerplate affidavits offer only scant support for the proposition that plaintiff's mark had acquired the requisite level of recognition among the relevant audience.

Third, though plaintiff claimed early on in the litigation that it has "achieved and sustained significant and substantial sales," it does not provide any actual sales figures. Ben Hooren TRO Decl. ¶ 81. Plaintiff's blanket assertion that Kosher Yellow Pages is "the print medium of choice" for high-end corporate advertisers and the six representative advertisements it submitted are no substitute for hard numbers. Ben Hooren TRO Decl. ¶¶ 25, 26 & Exs. M, N.

Fourth, plaintiff's only evidence of unsolicited media coverage is one 1999 article on David Ben–Hooren which centers its discussion on the Sephardic Yellow Pages directory and nowhere mentions the Kosher Yellow Pages directory by name. Ben–Hooren TRO Decl. Ex. O.

Fifth, plaintiff contends that defendants intentionally copied the Kosher Yellow Pages mark to take advantage of plaintiff's pre-existing name recognition. Revised Pl.'s Supplemental Mem. at 6. Plaintiff has marshaled evidence suggesting that defendants appropriated the Kosher Yellow Pages mark and doctored records to indicate that they were the first users of the mark. *See* Ben–Hooren Decl. ¶¶ 38, 39, 43, 45. But "although imitative intent can help support a finding of secondary meaning, it does not necessarily mandate one[.]" *Bristol–Myers Squibb Co.,* 973 F.2d at 1042 (internal citations omitted). *Cf. ITC Ltd. v. Punchgini, Inc.,* 373 F.Supp.2d 275, 291 (S.D.N.Y.2005) ("Although there may be some circumstances in which intentional copying is sufficient to show 'secondary meaning,' it would be tautological to conclude that copying alone demonstrates 'secondary meaning' ... where that copying is only prohibited ... if that mark has 'secondary meaning.' ").

Finally, regarding length and exclusivity of use, there is no magic time span that confers secondary meaning. *See Centaur Commc'ns, Ltd.,* 830 F.2d at 1225 ("Of course, no absolute time span can be posited as a yardstick in cases involving secondary meaning. Instead, the length and exclusivity of a mark's use is evaluated in light of the product and its consumers.") (citations omitted). For purposes of this motion, it is undisputed that plaintiff used the Kosher Yellow Pages mark exclusively from 2000 until 2003. While this is not an insignificant amount of time, particularly within the context of a niche market, the Court cannot conclude that a discrete four-year period during which plaintiff published no more than four editions of its directory was sufficient to cause the relevant audience to identify the Kosher Yellow Pages mark with plaintiff.

Having given careful consideration to the above factors, the Court concludes that plaintiff has failed to meet the "vigorous evidentiary requirements" necessary to show secondary meaning. Even crediting the evidence of intentional copying, the Court holds that no reasonable jury could find that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Bristol–Myers Squibb Co.,* 973 F.2d at 1041. Thus, even if Kosher Yellow Pages were classified as a descriptive rather than

a generic mark, it would not be entitled to protection.

## CONCLUSION

The Court agrees with Magistrate Judge Mann's recommendation that defendants' motion for summary judgment be granted. Plaintiff's federal infringement claim is therefore dismissed.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

MANN, United States Magistrate Judge.

Plaintiff The Jewish Sephardic Yellow Pages, Ltd. ("JSYP") brought suit under the Lanham Act and New York state law against defendants DAG Media, Inc. ("DAG Media" or "DAG") and its president and chief executive officer, Assaf Ran ("Ran"), alleging infringement of its unregistered trademark, "Kosher Yellow Pages." Defendants have moved for summary judgment on plaintiff's federal infringement claim on the ground that plaintiff's mark is ineligible for trademark protection. The Honorable Raymond J. Dearie, the District Judge assigned to the case, has referred the motion to the undersigned magistrate judge for a Report and Recommendation. For the reasons that follow, this Court recommends that the motion for partial summary judgment be granted.

## I. *INTRODUCTION*

Registration of trademarks in the United States Patent and Trademark Office ("PTO") is regulated by the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and regulations promulgated thereunder. The owner of a trademark used in commerce may request the registration of the mark by filing a verified written application with the PTO. A properly filed application will then be submitted to an examiner to determine whether the mark is eligible for registration.

The PTO maintains two registers for trademarks. The Principal Register is the primary registry of trademarks maintained by the PTO. 15 U.S.C. §§ 1051–1072 (2000). Registration on the Principal Register is *prima facie* evidence of ownership of, and an exclusive right to use, a valid trademark. 15 U.S.C. § 1115(a). To qualify for registration on the Principal Register, a trademark must be distinctive of the applicant's goods. 15 U.S.C. § 1052. If the PTO determines that a mark is not distinctive, and therefore not eligible for registration on the Principal Register, but is *capable of becoming* distinctive, that mark may be placed on the Supplemental Register. 15 U.S.C. § 1091. While registration on the Supplemental Register is not evidence of ownership, validity, or the exclusive right to use, such registration enables the registrant, *inter alia,* to sue for infringement in federal court. *See In re Bush Bros. & Co.,* 884 F.2d 569, 571 n. 2 (Fed.Cir.1989). If, through continuous use in commerce, the mark acquires "secondary meaning"—that is, the mark comes to be uniquely associated with its source—it becomes eligible for registration on the Principal Register. 15 U.S.C. § 1052(f); *see also* Catherine Rowland, "2003 Trademark Law Decisions of the Federal Circuit," 53 Am. U.L.Rev. 909, 925 n. 137 (2004).

## II. *FACTUAL BACKGROUND*

Plaintiff JSYP is a New York corporation that publishes and distributes telephone directories geared toward Jewish communities in New York, New Jersey and Florida. (Declaration of David Ben

Hooren[1] in Support of Plaintiff's Application For a Temporary Restraining Order and Preliminary Injunction ["Ben Hooren TRO Decl."] ¶ 7.) Plaintiff's first directory was published in 1997 under the name "The Sephardic Yellow Pages." (Compl.¶ 9.) At the time JSYP initiated this action, it had published five editions of "The Sephardic Yellow Pages": 1997–98, 1998, 1999–2000, 2000–01 and 2003. (*Id.* ¶¶ 9–10.)

In 1998 and 1999, JSYP developed advertisements promoting "The Sephardic Yellow Pages" as "The Only Kosher Yellow Pages" and "Your Kosher Yellow Pages." (Ben Hooren TRO Decl. ¶ 12 & Ex. E thereto; Defendants' Rule 56.1 Statement of Material Facts Not in Issue ["Def. R. 56.1"] ¶ 23 & Ex. 23 thereto.) These advertisements appeared in the "Official Directory" for Kosherfest, an annual trade show for the kosher food industry, and in "Strictly Business," a magazine targeted to the business community in Santa Maria, California. (Ben Hooren TRO Decl. ¶ 12 & Ex. E thereto.)

On February 16, 1999, JSYP filed a trademark application with the PTO to register the term "Kosher Yellow Pages." (Ben Hooren TRO Decl. ¶ 13 & Ex. F thereto.) The PTO denied the application on the ground that the term was "merely descriptive" and thus did not qualify for protection on the Principal Register.[2] (Ben Hooren TRO Decl. ¶¶ 13, 28, 29 & Ex. F thereto.)

In 2000, in addition to "The Sephardic Yellow Pages," JSYP published a second directory called "Kosher Yellow Pages."[3] (Ben Hooren TRO Decl. ¶ 11 & Ex. D thereto; Plaintiff's Local Rule 56.1 Statement of Material Facts ["Pl. R. 56.1"] ¶ 19.) The contents of the two directories were identical. (Pl. R. 56.1 ¶ 19.) Three more editions of "Kosher Yellow Pages" followed: 2001–02, 2003, and 2004. (Declaration of David Ben Hooren Submitted In Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ["Ben Hooren Opp. Decl."] ¶ 8 & Ex. 2 thereto.)

To promote its directories, JSYP distributes with each volume a "Kosher Discount Card," with which consumers may obtain discounts of up to 10 percent from participating advertisers, and operates the "Kosher Referral Service," a toll-free hotline (1–877–W–H–Y–KO–S–H–E–R) that matches consumers with advertisers who provide goods and services they are seeking. (Compl. ¶¶ 15, 16; Ben Hooren Opp. Decl. ¶¶ 19, 20 & Exs. 5, 6 thereto.) JSYP also owns two internet addresses, www.kosheryellowpages.com and syny.com,[4] both leading to the same website where it maintains online versions of its directories. (Ben Hooren TRO Decl. ¶ 8.)

Defendant DAG Media,[5] a publicly traded company listed on the NASDAQ exchange under the symbol DAGM, began publishing and distributing "The Jewish Israeli Yellow Pages," a bilingual (English–Hebrew) telephone directory, in the United States in 1990. (Defendants' An-

---

**1.** Plaintiff's submissions occasionally spell Ben Hooren's name with a hyphen.

**2.** *See generally infra* pp. 356–58.

**3.** The directory was called the "Fourth Edition, 2000–2001." (Ben Hooren TRO Decl., Ex. D.)

**4.** JSYP claims to also own the internet address www.kosheryellow.com. However, an

independent search by the Court reveals that this website is now defunct.

**5.** DAG Media is the surviving corporation of a merger with its subsidiary, Dapey–AssafHamadrikh Lesssakim Israelim Be New York, Ltd. The merger occurred in September 1999. (Def. R. 56.1 ¶ 3.)

swer to Verified Complaint, Counterclaim and Third Party Complaint ["Ans."] ¶¶ 10–11 [6]) The directory is published twice annually and is distributed throughout New York, New Jersey and Florida. (*Id.* ¶¶ 11–12, 15.) In December 1998, DAG Media began publishing an English-only directory under the name "The Jewish Master Guide," which is geared toward the Hasidic and ultra-Orthodox Jewish communities in the New York metropolitan area. (*Id.* ¶¶ 14, 16.)

In September 2002, DAG Media filed a trademark application with the PTO for registration of the mark, "The Kosher Yellow Pages," claiming to have used the mark as early as February 1995 in advertising and marketing materials for sale of advertising space in its telephone directories. (Ben Hooren TRO Decl. ¶¶ 45–46 & Ex. X thereto.) In March 2003, the PTO denied the application on the ground that the term was "merely descriptive," but invited DAG to amend its application to seek registration on the Supplemental Register (as a mark capable of becoming distinctive). (Ben Hooren TRO Decl. ¶ 48.) [7] DAG submitted an application for

reconsideration, which was also denied. (Ben Hooren TRO Decl., Ex. X; Declaration of Cathy E. Shore–Sirotin Submitted in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Ex. 1.) DAG then amended its application to seek registration on the Supplemental Register. (Ben Hooren TRO Decl. ¶ 48 & Ex. Y thereto.) On February 24, 2004, the PTO granted the amended application and registered "The Kosher Yellow Pages" on the Supplemental Register. (Ans. ¶ 18; Ben Hooren TRO Decl. ¶ 49.)

At some point in time, no later than 2003, DAG Media began to publish a telephone directory called "The Kosher Yellow Pages" (Pl. R. 56.1 ¶ 21), the contents of which were identical to those of "The Jewish Master Guide." (Ans. ¶ 23.) [8] In February 2004, DAG acquired the domain name www.kosheryellowpages.net. [9] (Ben Hooren TRO Decl. ¶ 32 & Ex. Q thereto.)

DAG Media is the owner of five trademarks on the Principal Register: "The Israeli Yellow Pages," issued July 29, 1997, "The Jewish Yellow Pages," issued March

---

6. Citations to paragraphs in defendants' pleading are to those portions that contain counterclaims and third-party claims.

7. The document denying DAG's application is not in the court file, but is available at http://portal.uspto.gov/external/portal/!ut/p/—s.7—0—A/7—0—1I1 /.cmd/ad/.ar/sa.gov.uspto.tow.actions.DetailViewAction/.c/6—0—CH/.ce/7—0—1JJ/.p/5—0—1CH/. d/0?isSubmitted=true & details = & SELECT = U.S. + Serial + No & TEXT = 76455772# ; then follow "12–Mar–2003 Offc Action Outgoing" hyperlink.

8. The parties vigorously dispute when DAG first began using the mark. DAG's Answer and application to the PTO each allege that DAG began using it in promotional materials in 1995. (Ans. ¶¶ 20, 25; Ben Hooren TRO Decl., Ex. X.) According to defendants' pleading, "[t]he first edition of DAG Media's 'The

Kosher Yellow Pages' directory was published in December 1998, and is dated 1999." (Ans. ¶ 26.) Plaintiff contends that these allegations are fraudulent and that defendants doctored evidence to support these assertions. (Ben Hooren Opp. Decl. ¶¶ 38–39, 42–46.) DAG acknowledges these factual disputes but, for purposes of this motion, relies on the fact that "it is undisputed that, since at least 2003, JSYP and DAG Media have both published and distributed a yellow pages type, classified business telephone directory known as the 'Kosher Yellow Pages.' " (Defendants' Memorandum Of Law In Support of Motion For Summary Judgment ["Def. Mem."] at 4.)

9. An independent search by this Court reveals that the website is now defunct. A page printed from Register.com, dated February 2, 2004, indicates that the website's registration was set to expire on February 12, 2006. (Ben Hooren TRO Decl., Ex. Q.)

2, 1999,[10] "The Jewish Master Guide," issued July 25, 2000,[11] "New Yellow," issued November 12, 2002, and "The Only Kosher Directory," issued July 15, 2003. It also owns three marks on the Supplemental Register, in addition to "The Kosher Yellow Pages": "The Jewish Referral Service," issued December 30, 1997, "The Kosher Directory," issued May 11, 2004, and "The Kosher Referral Service," issued May 19, 2005. (Ans. ¶ 17; *see generally* http://tess2.uspto.gov/bin/gate.exe?f= searchss & state=v90215.1.1.) [12]

On April 24, 2001, DAG Media filed a trademark action against JSYP and its founder and president, David Ben Hooren, in the United States District Court for the District of New Jersey, alleging that JSYP's use of the terms "The Only Kosher Yellow Pages" and "The Jewish Community Referral Service" infringed on DAG's common law trademark, "The Only Kosher Directory," and federally registered trademark, "The Jewish Referral Service." (Ans. ¶¶ 52–54 & NJ Compl. ¶¶ 9–11.) [13] On February 1, 2002, following a hearing on DAG Media's application for a preliminary injunction, the parties entered into a settlement agreement so-ordered by the Honorable William G. Bassler, and all claims were dismissed with prejudice. (Order on Settlement [Ran Decl., Ex. B].)

Under the terms of the settlement agreement, JSYP agreed to discontinue its use of the common law marks "The Only Kosher Yellow Pages" and "The Jewish Community Referral Service," and to cease distribution of all advertising and marketing materials containing these marks. (Settlement Agreement and Release [Ran Decl., Ex. B] at 3–4, 5–6.) JSYP was not prohibited from using the mark "Kosher Yellow Pages," provided that it informed its advertisers that this directory was "in no way affiliated with DAG and its directories...." (Settlement Agreement and Release [Ran Decl., Ex. B] at 4–5.)

JSYP initiated the instant lawsuit on February 24, 2004, alleging that DAG Media and Ran have used JSYP's mark, "Kosher Yellow Pages," in connection with the sale of their telephone directory, and that this use has misled customers into believing that DAG Media's product is sponsored by, authorized by, or otherwise connected with JSYP. The first cause of action

---

10. DAG asserts that "The Jewish Yellow Pages" mark was registered to the Supplemental Register on May 6, 1997. (Ans. ¶ 17.) An independent search of the PTO website reveals that, while this registration remains active, the mark was subsequently placed on the Principal Register on March 2, 1999 pursuant to section 2(f) of the Lanham Act. *See generally* http://tess2.uspto.gov/bin/gate.exe? f=searchss & state=v90215.1.1. It is unclear why the mark remains listed on the Supplemental Register, and why DAG did not present this evidence to the Court.

11. DAG Media also received a registration for "The Jewish Master Guide" as a service mark, issued on July 18, 2000. (Ans. ¶ 17.)

12. The parties advised the Court of only some of these trademarks. The Court learned of the others through an independent search of the PTO website. Several of the marks are formally registered to DAG Media's predecessor company, Dapey–Assaf. DAG Media claims to own a fifth mark on the Supplemental Register, "The Jewish Israeli Yellow Pages," issued April 8, 1997. (Ans. ¶ 17.) However, the PTO website indicates that this mark was cancelled on January 10, 2004, prior to the filing of this lawsuit. *See generally* http://tess 2.uspto.gov/bin/gate.exe?f = searchss & state =v90215.1.1.

13. A copy of the complaint in the District of New Jersey action ("NJ Compl.") is annexed as Exhibit A to the March 2004 Declaration of Assaf Ran ("Ran Decl."). The New Jersey complaint also alleged that JSYP and Ben Hooren had violated a restrictive covenant in a 1997 employment agreement between Ben Hooren and DAG. (NJ Compl. ¶¶ 13–15.)

alleges false designation of origin, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The second through fifth claims allege violations of state statutes-to wit, unfair competition, trademark infringement, injury to business reputation, trademark dilution, and use of name with intent to deceive, in violation of sections 349, 360–K, 360–L, and 133 of New York's General Business Law. Plaintiff seeks an accounting and, pursuant to 15 U.S.C. § 1119, cancellation of DAG Media's mark, "The Kosher Yellow Pages," currently on the Supplemental Register, on the ground that defendants' application for registration was fraudulent.[14]

In their responsive pleading, defendants assert that their use of "The Kosher Yellow Pages" mark predated plaintiff's (*see supra* note 8), that DAG Media is the rightful owner of the mark, and that, through DAG Media's "continuous advertising and promotion" of the product, "the name 'The Kosher Yellow Pages' has become well and favorably known to advertisers and end users as an indication of origin in DAG Media." (Ans.¶ 34.) Moreover, complaining that JSYP's use of the mark infringed defendants' rights, the Answer also includes a series of counterclaims and third-party claims against plaintiff and its principal, David Ben Hooren, arising under the Lanham Act and New York statutory and common law.[15]

During a contentious period of discovery, which the Court had ordered on an expedited basis (3/3/04 Calendar Order),[16] plaintiff accused defendants of fabricating evidence to corroborate their alleged early use of the mark by replacing the covers on directories originally published as "The Jewish Master Guide" with covers marked as "The Kosher Yellow Pages." (6/21/04 Letter to the Court from Darren Oved.) Plaintiff also sought the Court's intervention on numerous occasions to compel DAG Media to produce, or authorize its auditors to produce, financial documents that might shed light on when it began using the mark. (Letters to the Court dated 4/30/04, 5/7/04, 6/23/04 and 6/28/05, from Darren Oved.) Defendants denied any allegations of wrongdoing. (*See* 6/28/04 Letter to Judge Dearie from James Baxley.)

On October 4, 2004, in an apparent about-face, defendants sought leave to move for summary judgment on the ground that *neither party* is entitled to ownership of the "[The] Kosher Yellow Pages" mark because it is generic. (10/04/04 Letter to Judge Dearie from Carl Bornstein [ECF Docket # 66].) Plaintiff argued in opposition that, because the genericness defense represented an abrupt change of strategy on defendants' part, very little discovery had been taken on that issue and a motion for summary judg-

---

14. In the early stages of the litigation, Judge Dearie denied plaintiff's application for a temporary restraining order and defendants' application to transfer the case to the District of New Jersey under that court's retention of jurisdiction to enforce the parties' earlier settlement agreement. (*See generally* 3/8/04 Letter to Judge Dearie from Charles E. Baxley.)

15. The reply to defendants' pleading was not filed until almost two years later, on March 6, 2006. The reply adds fourth-party claims against DAG–Jewish Directories, Inc., a corporation formed for the purpose of purchasing from DAG the assets and liabilities of its

Jewish directories, including "The Kosher Yellow Pages." (Plaintiff's Answer to Defendants' Counterclaims ¶ 6.)

16. After Judge Dearie denied plaintiff's motion for a temporary restraining order, this Court set an expedited discovery schedule, with the expectation that a hearing on plaintiff's pending motion for a preliminary injunction would follow. Unfortunately, discovery became a prolonged ordeal, and plaintiff has not pressed for a hearing on its application for injunctive relief.

ment would therefore be premature. (11/24/04 Letter to Judge Dearie from Myron Greenspan.) On April 4, 2005, following a failed attempt at mediation (*see* 12/2/04 Order; 12/17/04 Endorsed Order), defendants filed the instant motion for summary judgment on plaintiff's Lanham Act claim, on the ground that "Kosher Yellow Pages" is ineligible for trademark protection because the term is generic or, in the alternative, merely descriptive without having acquired secondary meaning.[17]

On September 16, 2005, Judge Dearie referred the motion to the undersigned magistrate judge. (9/16/05 Order.) This Court heard oral argument on January 27, 2006. In response to plaintiff's argument that discovery had not been conducted with respect to defendants' new theory, the Court directed the parties to submit a report detailing what, if any, additional discovery they wished to take or to proffer in connection with the motion. (1/27/06 Calendar Order.) Plaintiff thereafter advised the Court that it had "no plans or intentions of taking further discovery of Defendants"[18] but that it was prepared to respond to defendants' long pending requests for discovery concerning secondary meaning. (2/17/06 Letter to the Court from Myron Greenspan at 1, 2; *see* 2/28/06 Calendar Order at 2.)

In a telephonic conference on February 28, 2006, the Court set a schedule for supplemental submissions from the parties on the issue of secondary meaning,[19] which submissions have now been filed. (*See* Revised Plaintiff's Supplemental Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ["Pl. Supp. Mem."]; Supplemental Declaration of David Ben Hooren ["Ben Hooren Supp. Decl."]; Defendants'/Third–Party Plaintiffs' Supplemental Memorandum Re Secondary Meaning ["Def. Supp. Mem."].) Defendants have stipulated that, if they prevail on their motion, they will withdraw their counterclaims, "with prejudice if need be." (3/1/06 Letter to the Court from Mark Heinze; *see* 2/18/06 Calendar Order at 1.)

## III. DISCUSSION

### A. Estoppel

As an initial matter, plaintiff contends that defendants are estopped from arguing that "Kosher Yellow Pages" is generic by reason of their previous assertions to the PTO, while applying to register the mark, that it is distinctive. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ["Pl. Mem."] at 6–9.) In support of this argument, plaintiff cites *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 256 (2d Cir.1962), and *Plus Products v. Natural Organics, Inc.*, No. 81 Civ. 1798, 1984 WL 33, at *3, 223 U.S.P.Q. 27(BNA) (E.D.N.Y. Feb.3, 1984), in which the defendants' prior attempts to register marks were held to bar them from recharacterizing their use

---

17. At oral argument, the defense clarified that its motion is addressed only to plaintiff's first cause of action, the Lanham Act claim; according to defendants, if they prevail on the motion, plaintiff's sixth claim (for cancellation of DAG's mark) will be rendered moot, and the only claims remaining will be state law claims. (Transcript of Oral Argument on January 27, 2006 ["1/27/06 Tr."] at 4–5, 6.)

18. Plaintiff did express a desire to serve Requests for Admissions (2/17/06 Greenspan Letter at 1), but acknowledged that these demands would pertain to priority of use, not to genericness or secondary meaning. (2/28/06 Calendar Order at 2.)

19. The Court declined plaintiff's invitation to bifurcate the issue of secondary meaning from defendants' genericness challenge. (2/28/06 Calendar Order at 2.)

of the marks when sued for trademark infringement.

Plaintiff's reliance on *Feathercombs* and *Plus Products* is misplaced. Unlike the case at bar, where defendants claim that plaintiff's mark is generic and therefore unprotectable, the defendants in *Feathercombs* and *Plus Products* each conceded initial validity of the mark and instead asserted a defense of fair use, a doctrine that allows one to use another's protected mark where such use is done "fairly and in good faith," solely to describe aspects of that party's own goods or services. *See* 15 U.S.C. § 1115(b)(4); *Car–Freshner Corp. v. S.C. Johnson & Son,* 70 F.3d 267, 269 (2d Cir.1995) ("The principle ... protects the right of society at large to use words or images in their primary descriptive sense, as against the claims of a trademark owner to exclusivity."). In other words, the critical issue in *Feathercombs* and *Plus Products* was the defendants' state of mind in using the marks; their attempts to register the marks established their intent to use the terms in a trademark sense, rather than in a merely descriptive sense, and thus belied their defense of good faith fair use. The defendants in those cases were therefore barred from asserting the fair use defense. *See Feathercombs,* 306 F.2d at 256 (holding that the defendant's prior application for registration of a mark served as conclusive evidence that it "intended to use the term ... in a trademark sense."); *accord Plus Products,* 1984 WL 33, at *3.

 In contrast, where, as here, a defendant asserts a defense of genericness against a claim of infringement of an unregistered mark, the critical issue is whether the mark is generic, and good faith is beside the point. Contrary to the assumption underlying plaintiff's opposition papers (Pl. Mem. at 1, 20), once the defense of genericness is raised, it is *plaintiff's* burden to establish that the unregistered mark is *not* generic, rather than defendant's burden to prove that it is. *See Reese Publ'g Co. v. Hampton Int'l Commc'n Inc.,* 620 F.2d 7, 11 (2d Cir. 1980); *accord Star Indus., Inc. v. Bacardi & Co. Ltd. Corp.,* No. 02 Civ. 4239(HB), 2003 WL 23109750, at *4 (S.D.N.Y. Dec.31, 2003). Plaintiff cannot prevail on its infringement claim unless it offers sufficient indicia of the mark's distinctiveness, notwithstanding defendants' inconsistent positions on this issue. *See Brandwynne v. Combe Int'l, Ltd.,* 74 F.Supp.2d 364, 382 n. 12 (S.D.N.Y.1999) (rejecting similar estoppel argument, as "defendants' mere use of the 'TM' symbol would not bestow a generic term with valid trademark status."); *Network Computers, Inc. v. Network Computer, Inc.,* No. 97 Civ.01908 MHP, 1997 WL 601433, at *4 (N.D.Cal. Sept.16, 1997) (rejecting plaintiff's contention that defendant's prior application for trademark protection barred it from arguing that the mark was generic; because it was plaintiff's burden to prove the mark was not generic, "[defendant's] inconsistent actions do not necessarily show that the [ ] term is not generic to the relevant public. If the [ ] term is generic neither [ ] defendants nor plaintiff may protect" it.); *Domino's Pizza, Inc. v. Little Caesar Enters.,* 7 U.S.P.Q.2d 1359, 1988 WL 252360, at *6 (P.T.O. Apr. 29, 1988) (rejecting contention that a party who previously appended trademark symbols to terms was estopped from arguing, in opposing another party's subsequent registration of those terms, that the terms were merely descriptive and could not function as trademarks; "the fact that opposer once indicated a different opinion than it now maintains would simply be one fact to be considered, together with all of the other facts of record ... in our determination...."). Thus, the rulings in *Feathercombs* and *Plus Products* are inapposite. *See Keebler*

*Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 375 n. 7 (1st Cir.1980) (rejecting plaintiff's reliance on *Feathercombs* and holding that defendant in trademark infringement action may assert defense of genericness despite having attempted to register the allegedly infringing mark).

■ Plaintiff's invocation of the doctrine of equitable estoppel is similarly unavailing, as plaintiff cannot demonstrate the requisite elements of reliance and injury. *See Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 905 n. 3 (7th Cir.1983) (defendant not equitably estopped from raising genericness defense, even though it had previously sought registration of the mark, in part because "the elements of reliance and injury necessary to estoppel are absent . . . ."); *accord Technical Publ'g Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir.1984); *Keebler*, 624 F.2d at 374 n. 7 (defendant not barred from arguing genericness where plaintiff could not show that it was "prejudiced by the opposing party's inconsistency."); *Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F.Supp.2d 239, 245 n. 3 (E.D.N.Y.1998) ("[Defendant's] abortive efforts to secure trademark protection for the term 'PowerCheck' do not preclude it from arguing [on summary judgment] motion that the term is descriptive. There has been no showing of misrepresentation or reliance that could arguably estop [defendant] from maintaining its current position."). In view of this Court's offer to reopen discovery on the issue of genericness—an offer that plaintiff decline [20]—plaintiff cannot claim that it relied in any way on defendants' prior position concerning the distinctiveness of the "Kosher Yellow Pages" mark, or that plaintiff was injured by any such reliance. *See Keebler*, 624 F.2d at 374 n. 7 (noting that the requisite injury might be said to have occurred if defendant gained some competitive advantage, such as a favorable licensing agreement with plaintiff that was based on an acknowledgment of the validity of the trademark).

■ In a related argument, plaintiff further contends argues that defendants' original theory in this litigation—that the mark was protectable and that defendants had priority of use—constitutes a judicial admission of descriptiveness, and that defendants should therefore not be heard to argue that the mark is generic. (Pl. Mem. at 9–11.) *See generally Young v. U.S. Dep't of Justice*, 882 F.2d 633, 639 (2d Cir.1989) ("[T]he judicial-estoppel doctrine, where it is recognized, may prevent a party who benefits from the assertion of a certain position, from subsequently adopting a contrary position."). However, defendants' admission—while probative and admissible-is, under the circumstances, not a binding one. *See Black & Decker Corp. v. Dunsford*, 944 F.Supp. 220, 225 n. 7 (S.D.N.Y.1996) (noting that defendants' "so-called judicial admissions of descriptiveness" in the answer and counterclaim "do not constitute binding admissions that the mark is descriptive."); *see also Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 929 & n. 2 (C.C.P.A. 1978) ("That a party earlier indicated a contrary opinion respecting the conclusion in a similar proceeding involving similar marks and goods is a fact, and that fact may be received in evidence as merely illuminative of shade and tone in the total picture confronting the decision maker. To that limited extent, a party's earlier contrary opinion may be considered relevant and competent. Under no circumstances, may a party's opinion, earlier or current, relieve the decision maker of the burden of reaching his own ultimate conclusion on the entire record."). The feder-

**20.** *See supra* p. 352.

al rules treat inconsistent pleadings liberally. *See Keebler,* 624 F.2d at 374 n. 7 (noting that, under Fed.R.Civ.P. 8(e)(2), a defendant may assert a counterclaim that is inconsistent with an affirmative defense raised in the same pleading, and may present a defense inconsistent with a position taken under oath in a separate prior proceeding); *accord Nestle Co., Inc. v. Chester's Mkt., Inc.,* 571 F.Supp. 763, 768 (D.Conn.1983), *rev'd and remanded on other grounds,* 756 F.2d 280 (2d Cir.1985).

Consequently, here, as in various other cases, defendants should be permitted to assert a defense of genericness to an infringement claim despite their prior attempt to register the mark and their prior litigation strategy in this case. *See, e.g., Keebler,* 624 F.2d at 374 n. 7; *Ideal World,* 15 F.Supp.2d at 245 n. 3 ("[N]or does [defendant's] initial decision to attempt to register PowerCheck as a trademark constitute a judicial admission against interest."); *Black & Decker,* 944 F.Supp. at 225 n. 7; *Nestle,* 571 F.Supp. at 768 (genericness defense "was not barred by the federal rules, notwithstanding [defendant's] seemingly inconsistent Puerto Rican trademark application.").[21]

## B. Legal Standard for Summary Judgment

A district court may not grant a motion for summary judgment unless it is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ideal World,* 15 F.Supp.2d at 242. The moving party bears the initial respon-

sibility of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). Once the moving party has met its burden, the party opposing the motion must set forth specific facts showing that there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(c). The opposing party may not rely on mere conclusory assertions, but instead must present evidence sufficient to enable the factfinder to return a verdict in favor of that party. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505 (noting that a factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

In reviewing a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Horizon Mills Corp. v. QVC, Inc.,* 161 F.Supp.2d 208, 211 (S.D.N.Y.2001); *GMT Prods., L.P. v. Cablevision of N.Y. City, Inc.,* 816 F.Supp. 207, 209–10 (S.D.N.Y. 1993). The judge's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

These principles apply with equal force to trademark cases. Although the "classification [of a mark] is a fact-bound determination," *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 144 (2d Cir. 1997), "[w]hen reasonable minds could not differ as to the import of the proffered

---

**21.** In the absence of any prejudice to plaintiff, defendants' genericness defense—although not pled—may be raised for the first time in their motion for summary judgment. *See*

*Levy v. Kosher Overseers Ass'n of Am., Inc.,* No. 92 Civ. 8377 DLC, 2000 WL 294842, at *1 n. 1 (S.D.N.Y. Mar.21, 2000).

evidence, then summary judgment is proper." *Horizon Mills*, 161 F.Supp.2d at 211; *see Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir.1996) ("[A]s with any question of fact, [the classification of a mark] can be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered."). "Summary judgment is improper if there is any evidence in the record from which a fair inference may be drawn on a material issue of fact in favor of the party opposing summary judgment." *Black & Decker*, 944 F.Supp. at 224 (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994)).

## C. Lanham Act Standards

Section 43(a) of the Lanham Act protects owners of both registered and unregistered marks from the use in commerce of any word, term, name or symbol that is likely to cause confusion as to the origin or sponsorship of goods or services. 15 U.S.C. § 1125(a); *see Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."). To prevail on a claim under Section 43(a), a plaintiff must show that (1) it has a valid trademark entitled to protection, and (2) the defendant's mark infringes on the plaintiff's mark by causing a likelihood of confusion among consumers as to the origin or sponsorship of its product. *See Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999); *Genesee Brewing*, 124 F.3d at 142; *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995). Where, as here, the plaintiff's mark is unregistered, the plaintiff bears the burden of proving that its mark is valid, which includes the burden of rebutting a defense that the unregistered mark is "generic"[22] and unprotectable. *See Reese Publ'g*, 620 F.2d at 11; *Horizon Mills*, 161 F.Supp.2d at 215 n. 8.[23] If plaintiff cannot establish that its mark is entitled to protection, the Court need not consider the second prong of the test, likelihood of confusion.

A mark is valid if it is sufficiently distinctive. The Second Circuit and other courts have established categories for classifying marks. "Arrayed in ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir.1992) (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).

A generic term consists of words that simply identify a class or genus of goods to which a particular product belongs. *See TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir.2001); *Abercrombie & Fitch*, 537 F.2d at 9. It is "the name of a product or service

22. *See infra* pp. 356–57.

23. In its opposition papers, plaintiff erroneously places the burden on defendants to prove that the mark is generic. (Pl. Mem. at 1, 20.) However, it is only where the mark is registered on the Principal Register that the party challenging the mark must overcome a strong presumption of validity. *See Horizon Mills*, 161 F.Supp.2d at 214–15. In contrast, where the mark is unregistered, or is registered only on the Supplemental Register, there is no such presumption. *See Reese Publ'g*, 620 F.2d at 11.

itself," disclosing "what it is," rather than describing a particular characteristic of the product or service. 2 *McCarthy on Trademarks and Unfair Competition* § 12:1 (4th ed.1997); *see Horizon Mills*, 161 F.Supp.2d at 211 (a generic term is "commonly used as the name for a type of goods."). Examples of generic terms include "Ale House" for an establishment that sells food and beer, *see Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140–41 (4th Cir.2000), "Cellular Sales" for the sale of cellular telephones, *see Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 486 (8th Cir.1991), "Light Beer" for beer that is light in body and taste, *see Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80 (7th Cir.1977), "Screenwipe" for a cloth used for cleaning computer and television screens, *see In re Gould Paper Corp.*, 834 F.2d 1017, 1018–19 (Fed.Cir.1987), and "The Arabic Channel" for an Arabic language television channel. *See GMT Prods.*, 816 F.Supp. at 207; *see also* 2 *McCarthy* § 12:18. Generic terms are never accorded trademark status, because to do so would grant a first-user a monopoly over common descriptive words that merely identify goods and services, depriving competitors of the opportunity to refer to their own goods and services as what they are. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 562 (2d Cir.1990) ("[C]onventional wisdom holds that generic terms ... are so useful to businesses selling the same product that no amount of money poured into promoting customers' association of generic terms with a particular source can justify 'depriving competing manufacturers of the product of the right to call an article by its name.'") (quoting *Abercrombie & Fitch*, 537 F.2d at 9); *CES Publ'g Corp. v. St. Regis Publ'ns*, 531 F.2d 11, 13 (2d Cir.1975). "This rule [also] protects the interest of the consuming public in understanding the nature of goods of-

fered for sale...." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir.1999).

■ Next in the classification hierarchy is the descriptive mark, which is one that "conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d Cir.1992); *see PaperCutter*, 900 F.2d at 563 (descriptive terms are those "conveying the characteristics of the goods, services or business, or indicating the purpose, function, size, quantity, capacity, or merits of a product, the effects of its use, or the class of intended purchasers.") (internal quotation marks and citation omitted). "A term can be descriptive in two ways: '[i]t can literally describe the product, or it can describe the purpose or utility of the product.'" *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns*, 830 F.2d 1217, 1220 (2d Cir.1987) (quoting *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 87 (2d Cir.1984)); *see PaperCutter*, 900 F.2d at 563. Terms held to be descriptive include "Apple Raisin Crisp" for breakfast cereal, *see Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir.1987), "The Sports Authority" for a sporting goods store, *see Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955 (2d Cir.1996), "Snakelight" for a flashlight with a flexible neck, *see Black & Decker*, 944 F.Supp. at 225, and "Tasty" for salad dressing, *see Henri's Food Prods. Co. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306 (7th Cir.1987); *see also* 2 *McCarthy* § 12:19. A descriptive term is eligible for trademark protection only if it acquires distinctiveness—also known as secondary meaning—such that the public has come to associate the mark primarily with its user. See *PaperCutter*, 900 F.2d at 562 ("[D]escriptive terms may, unlike generic terms, become entitled to protection if the 'descriptive meaning' of a word becomes sub-

ordinate and the term instead becomes primarily a symbol of identification, a process by which, put another way, the term acquires 'secondary meaning.'").

■ In contrast, a suggestive mark is one that does not describe, but merely suggests, the features of a product, requiring the purchaser to use "imagination, thought and perception to reach a conclusion as to the nature of goods." *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir.1999) (internal quotation marks and citation omitted). Examples of suggestive marks include "At A Glance" for calendars, *see Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 119–20 (S.D.N.Y.1989), "Citibank" for an urban bank, *see Citigroup Inc. v. City Holding Co.*, 171 F.Supp.2d 333 (S.D.N.Y. 2001), "Habitat" for home furnishings, *see Habitat Design Holdings, Ltd. v. Habitat, Inc.*, 436 F.Supp. 327, 331 (S.D.N.Y.1977), and "L'eggs" for women's hosiery, *see Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 465 (4th Cir.1996); *see also* 2 *McCarthy* § 11:72. A suggestive mark is considered inherently distinctive, and is protected without a showing of secondary meaning.

■ Lastly, arbitrary marks are those that employ common words in an uncommon way, such as "Ivory" for soap, while fanciful marks use words that were coined specifically to serve as a trademark, such as "Kodak" or "Exxon." *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075–76 (2d Cir.1993). Arbitrary and fanciful marks are, like suggestive ones, inherently distinctive, and they receive the highest degree of trademark protection. *Id.* at 1076.

■ Contrary to defendants' assumption, the classification of a mark "is a question of fact left to the determination of the district court." *Black & Decker,* 944 F.Supp. at 225 (quoting *Bristol–Myers,* 973 F.2d at 1039–40).[24] This is not an easy task, as "[t]he lines of demarcation ... are not always bright." *Abercrombie & Fitch,* 537 F.2d at 9; *see also Thompson Med. Co. v. Pfizer,* 753 F.2d 208, 212 (2d Cir. 1985) (noting that distinguishing the generic from the descriptive requires courts to make "[r]azor-thin judgment calls."). Compounding the difficulty of this undertaking is the fact that a mark's classification differs depending upon the goods it identifies. *See Abercrombie & Fitch,* 537 F.2d at 8. To take an oft-cited example, "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." *Bristol–Myers,* 973 F.2d at 1041 (citing 1 J.T. McCarthy, *Trademarks & Unfair Competition* § 11:22 at 498–99 (2d ed.1984)); *Black & Decker,* 944 F.Supp. at 225; *see also Genesee Brewing,* 124 F.3d at 148 (holding that "Honey Brown" is generic when applied to ales, but may be descriptive when applied to lagers).

**D. Classification of Plaintiff's Mark**

Defendants argue that plaintiff's mark is either inherently generic or descriptive (without secondary meaning), while plaintiff contends that the mark is suggestive, or at the very least descriptive (with secondary meaning). Before addressing defendants' genericness argument, the Court will first consider plaintiff's contention that the mark is suggestive.

---

**24.** Defendants erroneously argue that classification is a question of law, not fact. (1/27/06 Tr. at 31.)

## 1. Suggestive vs. Descriptive

█ Plaintiff's assertion that "Kosher Yellow Pages" is suggestive cannot withstand scrutiny. Plaintiff argues that the term does not immediately convey an idea of the nature of the product because it could refer to a "directory of kosher food, kosher utensils, stores selling kosher or Judaic products, or a listing of kosher restaurants." (Pl. Mem. at 26.) However, in order to be found descriptive rather than suggestive, "it is not necessary that a mark evoke in a customer's mind a precise vision of the product it identifies, but simply that the mark convey 'an immediate idea of some characteristic or attribute' of the product." *Tiny Tot Sports, Inc. v. Sporty Baby, LLC,* No. 04 Civ. 4487(DLC), 2005 WL 2044944, at *4 (S.D.N.Y. Aug.24, 2005) (holding that marks such as "Baby Golf" and "Baby Baseball" for videos introducing babies to sports are "descriptive as a matter of law," even though the videos contain many elements that are not apparent from the "Baby" marks themselves) (*quoting Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1341 (2d Cir.1992) (affirming ruling that PHYSICIANS FORMULA is descriptive, not suggestive, and noting that "it is not necessary . . . that the term also describe the specific . . . characteristics of the product . . . in order for the term to be descriptive.")).

In *Bristol–Myers,* the maker of Excedrin PM, an over-the-counter analgesic/sleep aid, argued that the mark "PM" is suggestive because a "consumer must engage in a multi-step analysis before coming to the conclusion that it denotes the presence of a sleep aid in the analgesic." 973 F.2d at 1040. Specifically, Bristol–Meyers argued, the consumer must first "eliminate possible alternate meanings for 'PM'—e.g., 'Pre–Menstrual' or 'Pain Medication'—before arriving at

'Post–Meridiem,' " then must "make a leap from all the post meridiem hours to those at night," and finally must make another "intellectual leap from nighttime to sleeping." *Id.* at 1040. The lower court rejected this argument and the Second Circuit affirmed, noting that, while "PM" in connection with Excedrin does not literally describe the presence of a sleep aid in the product, "it refers to the purpose or utility of the product—it is an analgesic that should be used at night." *Id.* "Once the consumer arrives at an awareness that the product is useful at nighttime, the 'purpose or utility' of the product has been conveyed, even though the consumer is not aware of why the product is useful at night." *Id.* at 1041.

So too here, while "Kosher Yellow Pages" does not describe the precise nature of the business listings contained in plaintiff's directory, a consumer need not employ imagination, reflection, or a "multistage reasoning process" [25] to understand that the mark denotes an alphabetized directory of businesses that in some manner appeal to consumers who observe or are otherwise interested in Kosher laws. *See, e.g., Frosty Treats, Inc. v. Sony Computer Entm't Am. Inc.,* 426 F.3d 1001, 1005 (8th Cir.2005) (holding that " 'Frosty Treats' is, at best, descriptive" of a business that sells frozen desserts out of ice cream trucks, as the term "conveys an immediate idea of the qualities and characteristics of the goods that it sells."); *Thompson Med.,* 753 F.2d at 216 & n. 15 (holding that "Sportscreme" is descriptive of a cream useful in sports even though the term is "inadequately descriptive" as to the "significance of the product—i.e., whether it is useful to relieve dryness, itchiness, odor or pain."); *McSpadden v. Caron,* No. 03–CV–6285 CJS, 2004 WL 2108394, at *13 (W.D.N.Y.

---

**25.** 2 *McCarthy* § 11.71.

Sept.20, 2004) (ruling that usamedicine.com trademark is descriptive, not suggestive, as used in connection with a website selling prescription drugs); *Ideal World*, 15 F.Supp.2d at 244 ("Power-Check," as applied to batteries featuring an on-battery tester of remaining battery power, is not suggestive, because it "conveys the immediate idea of the characteristics of the product.") (internal quotations and citation omitted); *Black & Decker*, 944 F.Supp. at 225 (holding that "Snakelight" is descriptive of a light fixture that can be bent or coiled).

### 2. Descriptive vs. Generic

 The more intricate issue in this case concerns the classification of the "Kosher Yellow Pages" mark as either descriptive or generic. The test for genericness is based upon "the primary significance of the [ ] mark to the relevant public." Trademark Clarification Act of 1984, Pub.L. No. 98–620 (codified at 15 U.S.C. § 1064). The "primary significance test" asks whether the consuming public understands and commonly uses the term to denote a particular source or origin of a product, even if that source is unknown (in which case the mark is descriptive), as opposed to the nature or class of the product (in which case the mark is generic). *See Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 113, 59 S.Ct. 109, 83 L.Ed. 73 (1938) (under the "primary significance test," a plaintiff seeking to establish a valid trademark "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer."); *Genesee*

*Brewing*, 124 F.3d at 144; *Horizon Mills*, 161 F.Supp.2d at 212–13.

A mark's common usage and understanding by the relevant public may be discerned from "any competent source," *In re Merrill Lynch*, 828 F.2d 1567, 1570 (Fed.Cir.1987), including consumer surveys, testimony of consumers or trade professionals, dictionary definitions, uncontested usage of the mark by competitors to describe their products, generic usage in newspaper and magazine articles, and generic usage by the proponent of the trademark. *See id.; Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810–11 (2d Cir. 1999); *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989); *Brandwynne*, 74 F.Supp.2d at 381–82. No single factor is dispositive. *See Horizon Mills*, 161 F.Supp.2d at 214 (citing *Murphy Door Bed*, 874 F.2d at 101).[26]

### a. *Dictionary definitions*

Defendants rely heavily on dictionary definitions to support their contention that "Kosher Yellow Pages" is inherently generic. They note that "kosher" and "yellow pages" are generic terms appearing in the dictionary[27] and argue that their combination yields a composite phrase that is similarly generic because it has the same meaning as the individual words. (Def. Mem. at 2, 20–24.) Plaintiff does not dispute that each term, standing alone, is generic. (Pl. Mem. at 11 n. 6.) "Kosher" is defined in the dictionary as follows: "1. sanctioned by Jewish law: ritually fit, clean, or prepared for use according to Jewish law (kosher meat); 2. selling, serving or using food that is ritually fit accord-

---

**26.** Another source of evidence—not relied upon by either party in this case—is testimony from expert witnesses on lexicography. *See Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F.Supp. 1270, 1274–75 (S.D.N.Y. 1983).

**27.** *See AmCan Enters., Inc. v. Renzi*, 32 F.3d 233, 234 (7th Cir.1994) (noting that " 'yellow pages' has become a generic term for a local business telephone directory alphabetized by product or service . . . .") (collecting cases).

ing to Jewish law (a kosher restaurant); 3. genuine, legitimate, proper ('tried to stop me from withdrawing the money, sensing that something was not kosher, but I wouldn't listen.')." *Webster's Third New International Dictionary* 1255 (1993). The term "yellow pages" is defined as "the section of a telephone directory on yellow paper and listing business subscribers according to the goods or services they offer." *Oxford American Dictionary and Language Guide* 1174 (1999). The parties disagree, however, on whether the mark "Kosher Yellow Pages" is as generic as its component parts.[28]

Dictionary definitions are relevant in assessing a mark's genericness "because they reflect the general public's perception of a mark's meaning and implication." *Murphy Door Bed*, 874 F.2d at 101. Nevertheless, dictionary definitions are far from dispositive; indeed, they are often of little use when analyzing a composite mark such as "Kosher Yellow Pages," because "[w]ords which could not individually become a trademark may become one when taken together." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C.Cir.1989) (quoting *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 379 (7th Cir.1976)); *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 692 (5th Cir.1992) ("If [plaintiff] had claimed the rights to either of the terms, 'pig' or 'sandwich,' standing alone,

without a doubt such a term would be generic, and thus unprotectable. When these two words are combined, however, they may attain protectable status."). Courts have eschewed the simplistic notion that "generic plus generic equals generic," *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1148 (9th Cir.1999), preferring to consider a trademark in its entirety, rather than as "elements separated and considered in detail." *Black & Decker*, 944 F.Supp. at 225 n. 6. Simply put, a "composite mark [ ] must be treated as a whole for classification purposes." *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 (2d Cir.2003) (holding that district court erred in concluding that if words used in a mark are generic, the mark is necessarily unprotectable). Thus, "the question of whether or not [a] composite mark is entitled to protection ultimately turns on whether it, as a whole, is distinctive." *Id.* at 217.[29]

While "kosher" and "Yellow Pages" are each generic terms, their pairing creates a non-intuitive phrase that does not "immediately and unequivocally describe[ ] the purpose and function" of plaintiff's product. *In re Merrill Lynch*, 828 F.2d at 1571 (holding that the term "CASH MANAGEMENT ACCOUNT" is "merely descriptive," not generic, and reversing decision of Trademark Trial and Appeal Board ["TTAB"] as clearly erroneous). Indeed,

---

**28.** In this connection, plaintiff moves to strike the affidavit of defense attorney Charles E. Baxley, on the ground that his opinion as to the classification of the mark constitutes inadmissible expert testimony of an attorney as to the ultimate issue in the case. (Pl. Mem. at 4 n. 5.) *See Ideal World*, 15 F.Supp.2d at 244 n. 2 (collecting cases). The Court declines to strike the affidavit, and instead treats Mr. Baxley's assertions as argument by counsel, not opinions of an expert.

**29.** The Federal Circuit's decision in *In re Gould Paper Corp.*, 834 F.2d 1017, is not to

the contrary. There the court held that the term "Screenwipes" is generic for a cloth used to wipe computer screens, because the terms "screen" and "wipes" "remain as generic in the compound as individually." *Id.* at 1019. Nevertheless, the Federal Circuit has cautioned that a composite mark consisting of multiple terms—such as "Kosher Yellow Pages"—must be analyzed as a whole, "for the whole may be greater than the sum of its parts." *In re Am. Fertility Soc'y*, 188 F.3d 1341, 1346 (Fed.Cir.1999).

defendants themselves have not been consistent in articulating the allegedly unambiguous import of the compound term at issue here. Defendants concede, as they must, that a directory cannot be kosher in the literal sense embodied in the primary (Judaic) definition of the word, inasmuch as publications are not "sanctioned by Jewish law" or "ritually pure." (*See* 1/27/06 Tr. at 11–12, 14, 34.) Defendants thus have proffered a series of different interpretations and, in so doing, have failed to identify the *principal* significance of the term to the relevant public.

Though they claimed in their motion papers that Kosher Yellow Pages "can have only one meaning" (Defendants' [Reply] Memorandum of Law in Support of Motion for Summary Judgment Pursuant to F.R.Civ.P. 56 ["Def. Reply"] at 9, 14), defendants have in fact posited alternative meanings, arguing that the mark "identifies *either* a directory focused principally on the kosher community, *or* it can refer to a directory of kosher goods." (Def. Mem. at 23) (emphasis added).[30] At oral argument, the defense shifted position yet again and maintained that the mark must be understood to use the word "kosher" not in the Judaic sense but in the secular, informal sense of "legitimate, clean or proper." (1/27/06 Tr. at 8, 11–12.)[31] Given the inherent ambiguity in the term "Kosher Yellow Pages"—particularly as applied to a telephone directory that includes listings for various businesses, ranging from banks to car services to dog groomers—it cannot be said that the phrase functions as the generic name for the product itself, the test for determining genericness. *See Berner Int'l Corp. v.*

*Mars Sales Co.,* 987 F.2d 975, 982 (3d Cir.1993) (holding that the term "air door" is not generic; while the term combines two commonly used words, it is "a phrase that has some measure of inherent incongruity; a door is usually understood as being solid while air is not."); *Gimix,* 699 F.2d at 906 (holding that "auto page" is non-generic, because the combined phrase is plausibly capable of identifying a number of different products, including a device to activate an alarm when a car is broken into and a machine that connects an answering service to a paging system); *Blue & White Food Prods. Corp. v. Shamir Food Indus., Ltd.,* 350 F.Supp.2d 514, 520 (S.D.N.Y.2004) (although the word "Shamir" means "dill" in Hebrew, the term "Shamir Salads" is not generic as used by plaintiff "to designate a large category of vegetable salads, dips, spreads, and herring products," because while some "may contain the herb dill . . . not all do. . . .").

In formulating guidelines for the classification of a mark, the Second Circuit has observed that where "it is hard to think of a better way to describe" the product than by using the disputed term, this constitutes strong evidence of the term's genericness. *Reese Publ'g,* 620 F.2d at 11; *see Genesee Brewing,* 124 F.3d at 145 n. 5 ("where the nature of a new product can be expressed in only one way, a manufacturer may not trademark the words necessary to describe the product.") Here, however, a variety of alternative names would be equally effective in describing the product to prospective consumers. For example, since 1998, defendants have marketed their directory under the name "The Jewish Master Guide"; as defendants have

---

**30.** However, the latter definition cannot be said to describe plaintiff's directory, which, defendants acknowledge, includes listings not limited to kosher businesses. (1/27/06 Tr. at 10.)

**31.** Specifically, defendants point to the fact that plaintiff screened its listings to include only those businesses that plaintiff regarded as reputable. (1/27/06 Tr. at 35–36.)

conceded for purposes of this motion, they did not append the name "The Kosher Yellow Pages" until in or about 2003, after plaintiff began publishing its own "Kosher Yellow Pages." Giving one party the exclusive right to use this name would hardly be tantamount to "grant[ing] an individual [the] right to call his wine 'rose,' his whisky 'blended,' or his bread 'white.' " *Horizon Mills*, 161 F.Supp.2d at 216–17 (citing Seventh Circuit's reasoning in *Miller Brewing*, 561 F.2d at 79–81 (holding that "Light Beer" and "Lite Beer" are generic because the words are so highly descriptive that they define what the product is, and cannot be appropriated without depriving competitors of the opportunity to effectively convey the nature of their own goods)).

In short, the "Kosher Yellow Pages" mark bears no resemblance to the names of publications and other goods that, through a combination of generic words, precisely and unambiguously conveyed the nature of their products and thus were found to be generic. *See, e.g., Reese Publ'g*, 620 F.2d at 10–11 (holding that "Video Buyer's Guide" is generic); *CES Publ'g*, 531 F.2d at 14–15 (holding that "Consumer Electronics Monthly" is generic); *Chum Ltd. v. Lisowski*, No. 98 Civ. 5060(KMW), 2001 WL 243541, at *8 (S.D.N.Y. Mar.12, 2001) (*"Chum I"*) ("fashion television" is generic); *GMT Prods.*, 816 F.Supp. at 211 ("The Arabic Channel" is generic and unprotectable, as it "describes a general category of services, namely, channels that broadcast in the Arabic language."); *Eastern Air Lines*, 559 F.Supp. at 1274–76 ("air-shuttle" is generic in the context of air transportation).[32]

### b. Generic use of the term

In addition to dictionary definitions, defendants point to plaintiff's generic use of the term "Kosher Yellow Pages" as evidence that the term is generic. Specifically, prior to publishing its "Kosher Yellow Pages," plaintiff created advertisements promoting its original directory, "The Sephardic Yellow Pages," as "Your Kosher Yellow Pages" and "The Only Kosher Yellow Pages." (Ben Hooren TRO Decl. ¶ 12 & Ex. E thereto.)[33] In addition, Ben Hooren, in his deposition testimony, occasionally described plaintiff's directory as a "kosher yellow pages." (Def. R. 56.1 ¶ 27; Affidavit of Charles Baxley in Support of Motion for Summary Judgment ["Baxley Aff."], Ex. G, at 54, 60, 209; Reply Affirmation of Carl Bornstein ["Bornstein Aff."], Ex. 32, at 60, 209.) Use of a term

---

**32.** Indeed, courts have recognized that, "unlike most goods, whose appearance will convey their nature, periodicals must depend principally on their titles to convey their character." *CES Publ'g*, 531 F.2d at 14; *accord H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed.Cir.1986) ("[M]agazines differ from other goods 'in that their title is a primary means of conveying their content ....' ") (quoting *Technical Publ'g*, 729 F.2d at 1140). Hence, "courts have been properly reluctant to find [ ] titles [of periodicals] generic in cases where the [periodicals] 'were not literally the class the title designated but were *about* that class.' " *Reese Publ'g*, 620 F.2d at 11 (quoting *CES Publ'g*, 531 F.2d at 14 (emphasis in original)); *see, e.g., Gruner + Jahr*, 991 F.2d at 1076

("PARENTS" mark, as applied to monthly magazine, is descriptive); *H. Marvin Ginn*, 782 F.2d at 991 (reversing decision of TTAB that "Fire Chief," as applied to monthly magazine circulated to fire departments, was generic); *Scholastic, Inc. v. Macmillan, Inc.*, 650 F.Supp. 866, 871 (S.D.N.Y.1987) (magazine title "Classroom" is descriptive trademark); *Am. Ass'n for the Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244, 255 (D.D.C.1980) (magazine title "Science" is descriptive, not generic).

**33.** Plaintiff contends that it used the term not in a generic sense but as a secondary mark or slogan. (Pl. Mem. at 19–20.)

as a generic name by the proponent of trademark status is considered strong evidence of genericness. *See Harley Davidson,* 164 F.3d at 811 (citing *Loglan Institute, Inc. v. Logical Language Group, Inc.,* 962 F.2d 1038, 1041 (Fed.Cir.1992)); 2 *McCarthy* § 12:13. This factor, however, is not dispositive. *See, e.g., E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,* 393 F.Supp. 502, 525 & n. 50 (E.D.N.Y. 1975). Moreover, in this case plaintiff's statements are counterbalanced by defendants' assertions to the PTO and in their pleadings that the term is *not* generic.[34]

The Second Circuit has "observed that newspaper and magazine use of a word in a generic sense is a 'strong indication of the general public's perception' that the word is generic." *Harley Davidson,* 164 F.3d at 811 (quoting *Murphy Door Bed,* 874 F.2d at 101); *see, e.g. U.S. Search, LLC v. U.S. Search.com, Inc.,* 300 F.3d 517, 525 (4th Cir.2002) (holding that "U.S. Search" is a generic or at most descriptive name for an executive recruiting service, where defendant presented numerous examples of competitors' use of the term as a synonym for executive recruiting-i.e., evidence that 3,600 employment placement firms used the word "search" in their name-as well as examples of media references to executive recruiting firms as "search firms"); *Ale House Mgmt.,* 205 F.3d at 141 (holding that "Ale House" is generic for establishment serving beer and food, in light of extensive evidence of generic use of the term by newspapers, books and other publications); *Mil–Mar*

*Shoe Co. v. Shonac Corp.,* 75 F.3d 1153, 1159 (7th Cir.1996) (holding that "Warehouse Shoes" is generic for large shoe store, based on evidence that more than 8,000 retail stores use the word "warehouse" in their names, and that hundreds of retail shoe stores use some form of either "Shoe Warehouse" or "Warehouse Shoes" in their names); *see also Sports Authority,* 89 F.3d at 961 (noting that third-party use of the disputed terms "may be relevant to the strength of [the] mark . . . .") (citing *Essence Commc'ns Inc. v. Singh Indus.,* 703 F.Supp. 261, 266 (S.D.N.Y.1988)).[35]

In the instant case, defendants concede that they have no proof that the term "Kosher Yellow Pages" has been used generically by third parties such as competitors or the media. (1/27/06 Tr. at 100–01.)[36] The absence of evidence of generic third-party usage further indicates that the term "Kosher Yellow Pages" has not come to be understood as generic by the relevant public.

### c. *Consumer surveys*

Neither side has presented a consumer survey on the issue of genericness. Surveys are "routinely employed" to test the genericness of a mark, because such surveys are "particularly helpful in divining . . . the principal significance" of the term to the consuming public. *Horizon Mills,* 161 F.Supp.2d at 220; *see Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 225 (2d Cir. 1999) (noting that surveys are "routinely

---

**34.** *See generally supra* pp. 352–55. In addition, DAG has registered analogous marks. *See infra* note 40.

**35.** Courts look to third-party usage even where, as here, the mark is unregistered and thus the proponent of the mark bears the burden of proving that the mark is *not* gener-

ic. *See, e.g., Ale House,* 205 F.3d at 140–41; *Mil–Mar Shoe,* 75 F.3d at 1156–57.

**36.** Moreover, the Court's own internet search has uncovered no third-party generic use of the term "Kosher Yellow Pages." *See Chum I,* 2001 WL 243541, at *8 n. 6 (court conducts Westlaw search for generic use of term at issue).

admitted in trademark [ ] cases to show [ ] genericness of a name. . . .''). Instead, plaintiff has submitted affidavits of 14 advertisers in which they each allege, in identical language, that "when I hear the name Kosher Yellow Pages, I automatically associate it with Mr. Ben Horen's [sic] telephone directory publication and no other.'' (Pl. Mem. at 13; Ben Hooren Opp. Decl. ¶ 34 & Ex. 12 thereto) Even assuming *arguendo* that affidavits from persons in the trade could, under certain circumstances, be deemed the functional equivalent of a consumer survey on genericness,[37] the boilerplate affidavits proffered by plaintiff in this case do not merit such consideration. *See Application of Mogen David Wine Corp.*, 54 C.C.P.A. 1086, 372 F.2d 539, 541–42 (1967) (where appellant prepared and submitted 50 similar affidavits of appellant's customers, TTAB properly found the documents to have little probative value); *Mech. Plastics Corp. v. Titan Techs., Inc.*, 823 F.Supp. 1137, 1149–50 (S.D.N.Y.1993) (in evaluating secondary meaning, court rejects "highly conclusory" and "biased" "two-page word-processed" affidavits from plaintiff's customers, in which " 'affiant' needed to enter only his or her name, title, and employer in the spaces provided in the first paragraph, and then at the bottom of the form, to enter the date in the space provided, and to have his/her signature notarized.''). Moreover, the affidavits of only 14 out of literally hundreds of advertisers in plaintiff's directory (*see, e.g.*, Kosher Yellow Pages

2003)[38] "is too insignificant to establish that the primary significance of the term is the producer and not the product. . . .'' *Eastern Air Lines*, 559 F.Supp. at 1275 (where only 10 percent of the individuals surveyed identified the word "Air–Shuttle" with Eastern Air Lines, mark was not entitled to trademark protection).

Nevertheless, while consumer surveys, if properly conducted, are highly probative, they are not required, and the lack of such evidence is not fatal to plaintiff's claim, at least at the summary judgment stage.

### d. Decisions of the PTO

A factor that militates against a finding of genericness is the PTO's decision to grant DAG's application to register "The Kosher Yellow Pages" on the Supplemental Register, having found that the term was descriptive and capable of acquiring distinctiveness through secondary meaning. Defendants deny that this decision was an implicit finding that the mark is not generic. (1/27/06 Tr. at 97–98; *but see id.* at 85–86.) Citing the Trademark Manual of Examining Procedure ("TMEP"), defendants contend that in refusing to register a mark to the Principal Register, trademark examiners are required to base that refusal upon Section 2(e) of the Trademark Act, which prohibits registration of marks that are merely descriptive. *See* TMEP § 1209.02 (3d ed.2003); 15 U.S.C. § 1052(e)(1). According to defendants, examiners are ordinarily not permitted to

---

**37.** As discussed in a subsequent section of this opinion, where the proponent of the mark derives its revenues solely from advertising, the Court may, in determining whether a mark has acquired secondary meaning, focus its inquiry on the perception of advertisers, and not just consumers. See cases cited *infra* pp. 368–69. It is less clear whether the views of plaintiff's advertisers are probative of nongenericness. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 n. 6 (7th

Cir.1986) (rejecting affidavits from plaintiff's customers, noting that, "[w]hile these affidavits address the issue of secondary meaning, they do not appear to address the issue of whether 'liquid controls' is a generic term in the mind of the public.'').

**38.** The full volume of the directory appears to be Exhibit D to the Ben Hooren TRO Declaration, although the Court's copy has been labeled "Exhibit C."

make a finding on genericness,[39] and therefore no conclusions can be drawn about a mark's genericness from the fact that the examiner issued a refusal based upon "mere descriptiveness." (Def. Reply 15–17.)

Defendants' analysis of the examining procedures is, however, incomplete, and their interpretation inaccurate. While an examining attorney is indeed required to base refusals of registration to the Principal Register upon Section 2(e)(1) for mere descriptiveness, the examiner is further instructed that, "if the designation appears to be a generic name for the goods or services, the [examiner] should provide an advisory statement that the subject matter appears to be a generic name for the goods or services, in conjunction with the refusal on the ground that the matter is merely descriptive." TMEP § 1209.02. On the other hand, where the designation appears to be capable of functioning as a mark, "the examining attorney should provide appropriate advice concerning a possible amendment to the Supplemental Register . . . ." *Id.* Here, the attorney examining DAG's trademark application invited DAG to seek registration on the Supplemental Register, thereby reflecting the examiner's view that the mark was indeed descriptive, rather than generic.

Further, examiners are *directed* to consider a mark's genericness when an applicant whose mark was denied registration on the Principal Register under Section 2(e)(1) amends its application to seek registration on the Supplemental Register. If the mark is generic, the examiner must refuse registration on the Supplemental Register. TMEP § 1209.02 ("If the exam-

ining attorney determines that the designation is a generic name for the applicant's goods or services, the examining attorney should then refuse registration on the Supplemental Register. The statutory basis for such a refusal is § 23 of the Trademark Act, 15 U.S.C. § 1091."); *see also In re Bongrain Int'l (Am.) Corp.,* 894 F.2d 1316, 1317 n. 4 (Fed.Cir.1990) ("If a mark is generic, incapable of serving as a means by which the goods of the applicant may be distinguished from the goods of others . . . it is not a trademark and cannot be registered under the Lanham Act.") (internal quotation marks and citation omitted); *H. Marvin Ginn,* 782 F.2d at 989 ("A generic term . . . can never be registered as a trademark because such a term is 'merely descriptive' within the meaning of § 2(e)(1) and is incapable of acquiring *de jure* distinctiveness under § 2(f).").

After receiving the examiner's initial refusal to register "The Kosher Yellow Pages" on the Principal Register, DAG amended its application to the Supplemental Register and was granted registration. The granting of the amended application suggests that the examiner determined the mark to be descriptive and capable of acquiring distinctiveness. *Cf. Ideal World,* 15 F.Supp.2d at 244. Although the examiner's conclusion obviously is not dispositive, courts "nevertheless 'accord weight' to the initial conclusions of the Trademark Office." *Genesee Brewing,* 124 F.3d at 148 n. 11 (citing *Arrow Fastener,* 59 F.3d at 392–93 (court "accord[s] weight . . . to the USPTO's decision not to register the mark without evidence of secondary meaning."), and *D.M. & Antique Import Corp. v. Royal Saxe Corp.,* 311 F.Supp. 1261, 1274 (S.D.N.Y.1970) ("[T]he expertise of the

---

**39.** TMEP § 1209.02 provides in part that "[a]n examining attorney should not issue a refusal in an application for the Principal Register on the ground that a mark is a generic name for the goods or services" unless the

applicant seeks registration based on a showing of acquired distinctiveness, under Section 2(f) of the Trademark Act (codified at 15 U.S.C. § 1052(f)).

trademark examiners does entitle their views to respectful consideration.'")); *Chum I*, 2001 WL 243541, at *8 ("The Court [ ] gives weight to the PTO examiner's determination that [the mark] is generic."); *see also Buti v. Impressa Perosa S.R.L.*, 139 F.3d 98, 105 (2d Cir.1998) ("[D]ecisions of the TTAB, while not binding on courts within this Circuit, are nonetheless 'to be accorded great weight.'") (quoting *Murphy Door Bed*, 874 F.2d at 101); *accord Courtenay Commc'ns*, 334 F.3d at 216–17.[40]

### e. Balancing the factors

Having weighed the foregoing factors, this Court rejects defendants' contention that plaintiff cannot meet its burden of proving that the term "Kosher Yellow Pages," as applied to a telephone directory of both kosher and non-kosher businesses, is entitled to protection as a trademark upon sufficient proof of secondary meaning. *See generally PaperCutter*, 900 F.2d at 563–64 ("Papercutter" is descriptive as applied to corporation engaged in selling paper designs and ornaments); *Thompson Med.*, 753 F.2d at 216–17 ("Sportscreme" is descriptive of topical heat analgesic); *Karmikel Corp. v. May Dep't Stores Co.*, 658 F.Supp. 1361, 1370 (S.D.N.Y.1987) ("Fast Track" is descriptive of athletic wear).

This conclusion is not inconsistent with the Ninth Circuit's decision in *Filipino Yellow Pages*, 198 F.3d at 1143, in which the Ninth Circuit affirmed the district court's grant of summary judgment denying trademark protection to the term "Filipino Yellow Pages." As a preliminary matter, the Ninth Circuit's decision did not rest on a finding of genericness, inasmuch as the appellate court concluded that the plaintiff had failed to establish secondary meaning. *Id.* at 1151. In any event, the term "Filipino" cannot be equated with the word "kosher," with its multiple connotations. Moreover, in discussing the classification of the mark "Filipino Yellow Pages," the Ninth Circuit noted that the district court had relied on the generic use of the same term in a newspaper article, and on the plaintiff's failure to protect the mark by bringing an infringement action against a third party who marketed another "Filipino Yellow Pages." *Id.* at 1151. Those factors are conspicuously absent from the present case. Accordingly, defendants are not entitled to summary judgment on the ground that the mark "Kosher Yellow Pages" is generic.

## E. Secondary Meaning

### 1. General Legal Principles

Resolution of the first prong of defendants' motion does not, however, end the

---

**40.** Notably, defendants do not dispute, and the Court's own research has confirmed, that two of DAG's marks, "The Jewish Yellow Pages," Reg. No. 2,227,306, and "The Israeli Yellow Pages," Reg. No. 2,083, 262, are registered on the Principal Register. (Ans. ¶ 17; 1/27/06 Tr. 15–16; *see generally* http://tess2.uspto.gov/bin/gate.exe?f=searchss & state=v90215.1.1.) Although defendants declined to say whether, under their genericness analysis, their own registered marks would be jeopardized (1/27/06 Tr. at 15–16, 44–45), these registrations reflect the views of both the PTO and defendants as to the classification of terms analogous to the one at issue here. Third-party registrations of similar marks, while not conclusive on classification issues, may be taken into consideration, *see generally Interstate Brands*, 576 F.2d at 928 (finding no error in the citation to third-party registrations); *In re Scholastic Testing Serv., Inc.*, 196 U.S.P.Q. 517, 519 (T.T.A.B.1977) (third-party registrations are not conclusive on the question of descriptiveness), particularly where the terms are strikingly similar and the registrant is one of the parties before the court. *Compare In re Busch Entm't Corp.*, 2000 WL 33321174, at *6 (T.T.A.B.2000) (registrations of different geographic terms were "of little help," as "each case must be decided on its own set of facts....").

Court's inquiry. A descriptive mark is not entitled to trademark protection unless its owner can "demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark." *Genesee Brewing*, 124 F.3d at 143 n. 4; *PaperCutter*, 900 F.2d at 564. For purposes of this motion, defendants do not dispute that plaintiff used the mark before they began publishing their "Kosher Yellow Pages" directory in 2003. (Def. Mem. at 4, 27; Def. R. 56.1 ¶ 22.) Because the proponent of the mark bears the burden of proof at trial on secondary meaning, plaintiff, in order to avoid summary judgment, must come forward with admissible evidence sufficient to create a genuine issue as to whether its "Kosher Yellow Pages" mark had acquired secondary meaning prior to the commencement of defendants' competing use of the mark in 2003. *See Diamond & Direct, LLC v. Star Diamond Group, Inc.*, 116 F.Supp.2d 525, 531 (S.D.N.Y.2000) (granting defendant summary judgment on Lanham Act infringement claim where no reasonable trier of fact could find secondary meaning).

To establish secondary meaning, the owner of the trademark must demonstrate "that the consuming public primarily associates the term with a particular source." *Bristol–Myers*, 973 F.2d at 1040; *see Centaur Commc'ns*, 830 F.2d at 1221 (the mark must come to identify the source of the goods, "even though the relevant consuming public might not know the name of the producer."); *PaperCutter*, 900 F.2d at 564 ("[I]f the term, although not inherently distinctive, comes through use to be uniquely associated with a single source, it is entitled to protection under the same principles applicable to inherently distinctive designations."). In other words, "[t]he crucial question is whether the public is moved to buy a product because of its source." *Murphy v. Provident Mut. Life Ins. Co.*, 923 F.2d 923, 928 (2d Cir.1990); *see Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133 (S.D.N.Y. 1972) ("[T]he consumer, having acquired confidence in the quality of a particular product through usage, is entitled to protection against imitations marketed by other producers.").

## 2. Relevant Segment of the Public

The inquiry into secondary meaning involves an assessment of recognition of the mark not by the general public, but rather by that segment of the public that comprises a producer's market. *See Centaur Commc'ns*, 830 F.2d at 1221 ("[I]t is not always the *general* public's understanding but—depending upon the product—often only a segment of consumers that need be examined.") (emphasis in original). In this case, much of plaintiff's evidence on secondary meaning concerns its efforts to create awareness of the mark among potential advertisers. (*See generally* Pl. Supp. Mem.) In response, defendants suggest that the evaluation of secondary meaning should focus not on advertisers but on consumers.[41] (Def. Supp. Mem. at 4–6.) The parties oversimplify the issue, as the perceptions of both segments of the community should be examined.

In analyzing the existence of secondary meaning in marks used in association with newspapers, magazines, television programs and other media, courts have con-

---

**41.** Defendants correctly note that plaintiff considers recognition of the mark by the consuming public to be a "secondary consideration." (Def. Supp. Mem. at 4–5.) While not directly challenging the relevance of name recognition among advertisers, defendants state that, "[e]ven assuming, arguendo, that plaintiff's effort to develop its advertiser base is sufficient to support secondary meaning" (*id.* at 6), the evidence proffered by plaintiff is insufficient to establish that plaintiff succeeded in achieving its goal. (*Id.* at 6–8.)

sidered the impact on industry professionals and advertisers, as well as consumers. *See, e.g., Centaur Commc'ns*, 830 F.2d at 1222 (accepting district court's unchallenged determination that the relevant consuming public in trademark dispute over magazine titles was "executives in the international marketing and advertising community in the United States."); *Chum Ltd. v. Lisowski*, No. 98 Civ. 5060(CBM), 2002 WL 1143208, at *1–2 (S.D.N.Y. May 29, 2002) (*"Chum III"*) (in trademark case involving titles of television programs, court considered the effect of the marks on both industry professionals and consumers-i.e., the viewing public) (citing *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386 (S.D.N.Y.1985) (in assessing likelihood of confusion, court defines the relevant consumer group in trademark dispute involving magazine titles to include advertisers, subscribers, and newsstand purchasers), *aff'd mem.*, 788 F.2d 3 (2d Cir.1986)). In particular, courts have found advertisers, along with the ultimate consumers, to be relevant segments of the public where, as here, a publication is distributed to its readership free of charge, and advertisers are therefore the mark owner's primary source of revenue. *See, e.g., Primedia Intertec Corp. v. Tech. Mktg. Corp.*, 35 F.Supp.2d 809, 818 (D.Kan.1998) (noting that "webzine's" readership was too small at the time to allow a determination of secondary meaning among readers, and that plaintiff "lacks evidence that the webzine has acquired any secondary meaning among advertisers, the webzine's only source of revenue."); *Gazette Newspapers, Inc. v. New Paper, Inc.*, 934 F.Supp. 688, 695 (D.Md. 1996) ("Because readers and advertisers have come to identify 'Gazette' newspapers with the plaintiff's chain of papers, I conclude that plaintiff has established secondary meaning . . . ."); *Durango Herald, Inc. v. Riddle*, 719 F.Supp. 941, 949 n. 7 (D.Col.

1988) (finding that telephone directory had acquired "strong secondary meaning within the relevant market of general consumers and advertisers in the communities served by" plaintiff); *Fox Broad. Co. v. Fox Broad. Co.*, Civ. A. No. 86–4989, 1986 WL 11445, at *7 (E.D.Pa. Oct.9, 1986) (concluding that plaintiff "has failed to satisfy its burden of proving that 'Fox Broadcasting Company' has a secondary meaning, i.e., that advertisers and the public associate [the term] with plaintiff's radio stations.").

The relevant public in this case therefore consists of consumers—specifically, members of the Jewish communities in New York, New Jersey and Florida—*and* local advertisers.

### 3. Analysis of Factors Relevant to Secondary Meaning

"The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation." *Bristol–Myers*, 973 F.2d at 1041 (quoting *PaperCutter*, 900 F.2d at 564). Proof of secondary meaning "entails vigorous evidentiary requirements." *Bristol–Myers*, 973 F.2d at 1041 (internal quotation marks and citation omitted). Among the factors that courts have found relevant are advertising and promotional efforts, sales success, consumer surveys, unsolicited media coverage, attempts to plagiarize the mark, and length and exclusivity of the mark's use. *See Centaur Commc'ns*, 830 F.2d at 1222; *Thompson Med.*, 753 F.2d at 217. No single factor is determinative, and every element need not be proved. See *Murphy*, 923 F.2d at 928; *Centaur Commc'ns*, 830 F.2d at 1222. As a general rule, however, "the more descriptive the term, the greater the evidentiary burden to establish secondary meaning." 2 *McCarthy* § 15:28. Because the "Kosher Yellow Pages" mark is a relative-

ly weak descriptive mark, plaintiff bears a heavy burden to establish that the mark has acquired secondary meaning. The Court will address each factor in turn.

### a. Consumer Surveys

"A consumer survey is the most persuasive element in demonstrating secondary meaning, because [it] provides direct evidence" of whether consumers associate a trademark with plaintiff's company. *Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc.*, No. 94 Civ. 2732, 1996 WL 143903, at *8 (S.D.N.Y.1996) (citing *20th Century Wear*, 815 F.2d at 10); *see Centaur Commc'ns*, 830 F.2d at 1223 (observing that "surveys have become the usual way of demonstrating secondary meaning . . . ."). Plaintiff has not presented any survey evidence of the extent to which either consumers or advertisers associate the mark "Kosher Yellow Pages" with JSYP. While plaintiff need not establish each of the factors relative to secondary meaning, this Court "finds it quite significant" that plaintiff "did not muster any survey evidence demonstrating the requisite link in the minds of consumers" between the mark at issue and plaintiff's directory. *Chum Ltd. v. Lisowski*, 198 F.Supp.2d 530, 534 (S.D.N.Y.2002) (*"Chum II"*).

In lieu of a consumer survey, plaintiff relies on a series of identical affidavits from 14 of its advertisers, all of whom claim that they "automatically associate" the name "Kosher Yellow Pages" with plaintiff's directory. (Ben Hooren Opp. Decl. ¶ 34 & Ex. 12 thereto.) Courts are permitted to consider "anecdotal" evidence in the form of "direct testimony by consumers" in assessing secondary meaning. *See Centaur Commc'ns*, 830 F.2d at 1223. Nevertheless, as previously discussed, boilerplate affidavits containing conclusory as-

sertions linking the mark to plaintiff are of limited evidentiary value.[42] Furthermore, unlike a survey of disinterested consumers, affidavits from a handful of individuals doing business with one of the parties pose issues of objectivity; understandably, courts have concluded that "testimony from persons closely associated with the plaintiff does not adequately reflect the views of the buying public[.]" *Filipino Yellow Pages*, 198 F.3d at 1152 (collecting cases). "[T]his is because trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark." *Id.* (internal quotation marks, citation and brackets omitted).

Each of the affidavits proffered by plaintiff (including Ben Hooren's own self-serving declaration) constitutes "[e]vidence of secondary meaning from a partial source [and thus] possesses very limited probative value." *Id.; see Adams/Green Indus. Publ'g, Inc. v. Int'l Labmate Ltd.*, No. 96 C 7456, 1997 WL 722964, at *6 (N.D.Ill. 1997) ("In light of the other evidence, statements as to name recognition by 11 advertisers selected by [the proponent of the mark] [are] insufficient to support a genuine factual dispute as to secondary meaning."). Furthermore, affidavits from 14 advertisers in no way "show that a 'substantial' segment of the relevant purchasing public makes an affirmative association" between the mark "Kosher Yellow Pages" and JSYP. *Ergotron*, 1996 WL 143903, at *7 (quoting *Coach Leatherware Co. v. AnnTaylor Inc.*, 933 F.2d 162, 168 (2d Cir.1991)); *see Fox Broad.*, 1986 WL 11445, at *7 ("While plaintiff presented evidence that a few listeners had inquired about the possible connection between plaintiff and defendant, the small number

---

**42.** *See* cases cited *supra* pp. 364–65.

of inquiries does not support the conclusion that the public attached secondary meaning to plaintiff's name."); *In re Paint Prods. Co.,* 8 U.S.P.Q.2d 1863, 1866 (T.T.A.B.1988) ("Because these affidavits were sought and collected by applicant from ten customers who have dealt with applicant for many years, the evidence is not altogether persuasive on the issue of how the average customer for paints perceives the words 'PAINT PRODUCTS CO.' in conjunction with paints and coatings."). Consequently, the "consumer survey" factor weighs heavily against a finding of secondary meaning.

### b. Advertising efforts

"Advertising expenditures provide indirect evidence of the possible effect that advertising may have on consumers' association of the [trademark] with the source of the product." *Ergotron,* 1996 WL 143903, at *8. Plaintiff avers that it has "expended and continues to expend many tens of thousands of dollars every year in advertising, marketing, solicitations and such other forms of promotion to develop the substantial good will and reputation it presently enjoys." (Ben Hooren TRO Decl. ¶ 23.) Nevertheless, "[m]erely showing that a certain amount was spent on advertising provides little support for secondary meaning. It must be shown that there was promotion of the mark as an identifier for the product." *Adams/Green,* 1997 WL 722964, at *5; *see Ergotron,* 1996 WL 143903, at *8 ("[J]ust because a producer spends money on advertising does not mean that the public will make that association."). Judged by these standards, plaintiff's proof is insufficient to support a finding that by the time defendant began using the mark in 2003, plaintiff's advertising and promotional efforts had created in the minds of the consuming public and advertisers an identification of the "Kosher Yellow Pages" mark with JSYP.

As an initial matter, conspicuously absent from much of plaintiff's proof is any specification as to the amounts expended in promoting the "Kosher Yellow Pages" directory. Although plaintiff claims to have spent $63,828 in 1999 and $258,828 in 2000 to place "dozens of advertisements" in "multiple newspapers and magazines," including seven publications geared toward Jewish audiences (Ben Hooren Supp. Decl. ¶¶ 51–52),[43] plaintiff provides no information concerning the proportion of expenditures dedicated to promoting its "Kosher Yellow Pages," as opposed to plaintiff's other directory, "Sephardic Yellow Pages."[44] Even where plaintiff claims to have devoted specific efforts to promoting the "Kosher Yellow Pages" exclusively, such as spending between $90,000 and $164,000 each year from 1999 to 2003 on phone solicitations to potential advertisers (Ben Hooren Supp. Decl. ¶ 50), the record is silent as to the number of calls made and the success rate.[45] *See Ergotron,* 1996 WL 143903, at *8.

---

**43.** These publications include: Sentinel News, Jewish Press, Jewish Week, Crown Heights Direct, Shalom USA, Jewish Israeli Magazine, and Maharim Newspapers. (Ben Hooren Supp. Decl. ¶ 52.)

**44.** Plaintiff has proffered a copy of an advertisement dated September 13, 2002, promoting its "Kosher Yellow Pages," and claims that it is "the same or typical" of the other ads it placed. (Ben Hooren Supp. Decl. ¶ 51.) This leaves ambiguous which directory the other ads featured. Given the fact that plain-

tiff did not publish its first "Kosher Yellow Pages" until 2000, it seems improbable that much of its advertising in 1999 was dedicated to promoting that directory. *See Mulberry Thai Silks, Inc. v. K & K Neckwear, Inc.,* 897 F.Supp. 789, 794 (S.D.N.Y.1995) (expressing doubt as to whether advertising in 1993 could have been focused on a product that did not even ship until 1994).

**45.** Moreover, in an earlier declaration, Ben Hooren averred that "[a]dvertisements for both the SEPHARDIC YELLOW PAGES and

Such "[n]aked advertising statistics ... are insufficient to establish secondary meaning." *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 411 (S.D.N.Y.1974) (where plaintiff marketed products under several different names, advertising statistics were insufficient to prove secondary meaning of a particular mark without evidence of the nature and quality of the advertising, and of the extent to which the advertising emphasized the mark at issue); *see Murphy,* 923 F.2d at 928 (affirming district court's determination that plaintiff's mark lacked secondary meaning, noting that that court had found, among other things, "no evidence of [advertising] expenditures that were related solely to" the disputed mark); *Grupke v. Linda Lori Sportswear, Inc.,* 921 F.Supp. 987, 996 (E.D.N.Y.1996) (Nickerson, J.) (granting summary judgment for defendant as to infringement of plaintiff's unregistered trademark, where plaintiff t-shirt designer failed to show what portion of its general advertising budget was devoted to t-shirts with the mark it sought to protect); *Mulberry Thai Silks, Inc. v. K & K Neckwear, Inc.,* 897 F.Supp. 789, 794 (S.D.N.Y.1995) (plaintiff in trade dress infringement case failed to establish secondary meaning where it stated that it spent $25,000 on advertising its ties in 1993, yet presented "no evidence that it ever advertised the designs of the specific ties in question, which were not even shipped until 1994.").

Nor does the record contain evidence from which the Court can assess the exposure of the relevant public to plaintiff's advertising. For example, even assuming that plaintiff's newspaper and magazine advertising did in fact focus on its "Kosher Yellow Pages" directory, plaintiff provides no information whatsoever concerning the circulations of those publications—and only limited information concerning their audiences—thereby impeding the Court's inquiry into the extent to which the ads reached the relevant consumer audience. Plaintiff's other promotional efforts included printing (in 2000) 50,000 stickers reading "Push" and "Pull," with the name and photograph of its "Kosher Yellow Pages" directory, for businesses to affix to the doors of their establishments; and equipping plaintiff's salespeople with 11.5″ by 24″ magnetic signs reading "Kosher Yellow Pages," to attach to the side doors of their vehicles. (Ben Hooren Supp. Decl. ¶¶ 60–61 & Ex. 22 thereto.) As plaintiff omits to disclose how many of these stickers and signs were actually distributed and displayed, the proffered evidence is of little value. *See Chum II,* 198 F.Supp.2d at 534 ("Although it is certainly relevant that [plaintiff] spent substantial sums of money promoting its [weekly television magazine] program to industry executives, the court finds it at least equally relevant that [plaintiff] has not adequately demonstrated it spent much, if anything at all, attempting to promote its program directly to the viewing public.").

The impact of plaintiff's advertising efforts on the development of secondary meaning is further undercut by plaintiff's inconsistent use of the "Kosher Yellow Pages" mark. Billboards placed at four locations in Brooklyn and New Jersey emblazoned with the slogan, "The Only Kosher Yellow Pages In the World," con-

---

JSYP's KOSHER YELLOW PAGES directories are presented or offered for sale at the same time, as a package, but advertisers can choose to advertise in either or both directories." (Ben Hooren Opp. Decl. ¶ 16.) This suggests that plaintiff's sales calls to advertis-

ers were not in fact for the limited purpose of "introduc[ing] and try[ing] to sell advertising space in the KOSHER YELLOW PAGES directory," as Ben Hooren claims in his supplemental declaration on secondary meaning. (Ben Hooren Supp. Decl. ¶ 50.)

tained only a small, easily overlooked photograph of the "Kosher Yellow Pages" directory. (Ben Hooren Supp. Decl. ¶ 54 & Ex. 18 thereto.) Likewise, plaintiff's "Kosher Discount Card" (50,000 of which were printed each year from 2000 through 2003), as well as the license plate frames distributed by plaintiff to its salespeople, all contained the phone number 877–WHY–KOSHER and the internet address www.syny.com, but no reference at all to the "Kosher Yellow Pages" directory. (Ben Hooren Supp. Decl. ¶¶ 57, 62 & Exs. 20, 23 thereto.) "Evidence of advertising and sales ... does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark." 2 *McCarthy* § 15:48 (quoting *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 729 (7th Cir. 1998)); *see also Fraga v. Smithaven MRI,* 866 F.Supp. 107, 112 (E.D.N.Y. 1994) (although plaintiff, a magnetic resonance imaging center doing business as "OPEN MRI" or "DIAL OPEN–MRI," spent "a relatively large amount" on advertising, "the fact that plaintiff infused the market with several names—'OPEN MRI,' 'DIAL–OPEN–MRi,' '516–OPEN MRI,' and 'DIAL (516) OPEN–MRi'—decreases the likelihood that any one name acquired secondary meaning."); *Sizes Unlimited, Inc. v. Sizes To Fit, Inc.,* 871 F.Supp. 1558, 1564 (E.D.N.Y.1994) (dismissing complaint where plaintiffs who sought to protect their right to the word "SIZES," as applied to retail clothing stores, "made no showing that [their] promotional expenditures generally feature or focus" on that mark; the signs on plaintiffs' various store were different and "do not demonstrate any focus on a single SIZES mark.").

Consequently, "[t]he evidence that [plaintiff's] advertising efforts were effective in generating sales is inconclusive," *Kangadis, Inc. v. Euphrates, Inc.,* 378 F.Supp.2d 162, 167 (E.D.N.Y.2005), and weighs against a finding of secondary meaning.

### c. Sales Success

Though claiming to have "achieved and sustained significant and substantial sales operating as and under its trade name and mark of 'Kosher Yellow Pages'" (Ben Hooren TRO Decl. ¶ 81), plaintiff provides no sales figures whatsoever. In fact, the only evidence even touching on this point consists of copies of six advertisements—from jewelry companies, high-end car dealerships, and a New York hospital—that presumably appeared at one time or another in one or both of plaintiff's directories. (Ben Hooren TRO Decl. ¶ 25 & Exs. M, N thereto.) Plaintiff's conclusory assertion that its "Kosher Yellow Pages" directory has "been selected as the print medium of choice" for these "steady, loyal and long-term corporate advertisers" (Ben Hooren TRO Decl. ¶¶ 25, 26), is plainly insufficient proof of sales success. *See Chum II,* 198 F.Supp.2d at 535 (according little weight to plaintiff's "bits of anecdotal evidence that its [television] program was one of VH–1's 'highest rated' programs and that its United States revenues have been 'very significant' and that it is 'well known in the trade[,]'" inasmuch as plaintiff did not present "any real evidence regarding [its resulting] revenues," and this "dearth of hard numbers in the record ... is glaring.").

The record is similarly devoid of distribution figures reflecting the number of consumers who actually received plaintiff's "Kosher Yellow Pages" directory.[46] Evi-

---

46. When asked during his deposition to state

the number of directories distributed annual-

dence of traffic on plaintiff's website is not an adequate substitute, as it does not indicate whether the figures represent unique visitors, as opposed to visitors who accessed the site on multiple occasions and/or who opened multiple files.[47] The Court therefore has no evidence from which to conclude that prior to 2003, the consuming public was sufficiently exposed to the mark to associate it with its source. *See Chum II,* 198 F.Supp.2d at 535 (noting that plaintiff, seeking protection for its "FT–Fashion Television" mark as applied to a weekly news magazine program, "presented no real evidence regarding how many United States viewers *actually watch* its program.") (emphasis in original). This factor thus cannot be said to weigh in favor of a finding of secondary meaning.

### d. Unsolicited media coverage

A finding of secondary meaning may be supported by proof that "the enthusiasm and loyalty of [plaintiff's customers] have been the subject of extensive, unsolicited media coverage...." *Harlequin Enters. Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981). In connection with this factor, plaintiff has submitted a single article, published in the Winter 1999 edition of Lifestyles, a magazine aimed at an affluent Jewish readership throughout North America. Although Ben Hooren describes the piece as "an extensive article

about JSYP and its Kosher Yellow Pages directory," which piece was allegedly prompted by the directory's "extraordinary name recognition, reputation, service and sales" (Ben Hooren TRO Decl. ¶ 27), the article actually predates the publication of that directory, and focuses exclusively on "The Sephardic Yellow Pages." (Ben Hooren TRO Decl., Ex. O.) While the article does mention one of plaintiff's websites, www.kosheryellowpages.com, this passing reference is hardly significant in the context of the three-page article. As "[t]here does not appear to be any notable unsolicited media coverage," *Ergotron,* 1996 WL 143903, at *8, this factor weighs against a finding of secondary meaning.

### e. Length and Exclusivity of the Mark's Use

In connection with the length and exclusivity of the mark's use, "no absolute time span can be posited as a yardstick in cases involving secondary meaning." *Centaur Commc'ns,* 830 F.2d at 1225. "Instead, the length and exclusivity of a mark's use is evaluated in light of the product and its consumers." *Id.; see Ralston Purina,* 341 F.Supp. at 134 ("In a market [as] new and unsettled [as plaintiff's], it is doubtful that the name of any product could have acquired secondary meaning in [less than one year].").

For purposes of this motion it is undisputed that plaintiff used its mark exclu-

---

ly, Ben Hooren responded that he was unable to provide this information. (Def. R. 56.1 ¶¶ 28, 29 & Ex. 34 thereto.) In response to discovery requests, plaintiff produced invoices for a total of 30,300 books, in two versions, from a printing company in 2001. (Def. R. 56.1 ¶ 32.) Defendants infer from this evidence that no more than 15,150 copies of the "Kosher Yellow Pages" were published that year. (*Id.*) While plaintiff denies that this is the total number of directories published in 2001 (Pl. R. 56.1 ¶ 32), it has provided no further evidence reflecting the actual number.

47. Plaintiff states that in 1999, it "established a KOSHER YELLOW PAGES website in which the mark ... was prominently shown and used in conjunction with the KOSHER YELLOW PAGES directory," and that the website received an exponentially increasing number of "hits" each year from 1999 (33,-321) to 2003 (749,981). (Ben Hooren Supp. Decl. ¶ 49.)

sively from at least 2000, when it published its first (annual) edition of the "Kosher Yellow Pages" directory, until 2003, when defendant published its version of "The Kosher Yellow Pages" directory. In the context of the publishing industry, this mark "does not have a particularly long history...." *Adams/Green,* 1997 WL 722964, at *6 (contrasting seven-year history of the mark at issue with "Science Magazine, which had been in existence since 1880 and published weekly...."). Nevertheless, given the well-defined nature of plaintiff's market—Jewish consumers and local advertisers in New York, New Jersey and Florida—three to four years of exclusive use is somewhat significant. *See, e.g., Centaur Commc'ns,* 830 F.2d at 1225 (holding that "the relatively small size of the defined market," i.e., executives in the international marketing and advertising community in the United States, as well as the "interconnections developing between [plaintiff's and defendant's target markets], indicate that [plaintiff's eight-year exclusive] use of the mark is more significant in this context than it otherwise would have been."). This factor therefore weighs to some extent in plaintiff's favor.

### f. *Intentional copying*

Plaintiff contends that defendants, with knowledge of plaintiff's prior exclusive use of the mark, intentionally copied it to capitalize on the good will that plaintiff had created. (Pl. Supp. Mem. at 6.) "Though intentional copying constitutes persuasive evidence of consumer recognition, conscious replication alone does not establish secondary meaning." *Coach Leatherware,* 933 F.2d at 169 (citation omitted); *see 20th Century Wear,* 815 F.2d at 10 (intentional copying is "not conclusive" of secondary meaning); *Bristol–Myers,* 973 F.2d at 1042 (district court's finding that evidence of copying did not establish secondary

meaning was not erroneous, because "[a]lthough imitative intent can help support a finding secondary meaning, it does not necessarily mandate one.") (internal citation omitted); *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwarz,* 184 F.Supp.2d 311, 319 (S.D.N.Y.2001) ("Proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent.").

"Where copying has occurred, there may be a number of explanations that rebut any inference of secondary meaning." *Ergotron,* 1996 WL 143903, at *9. For example, rather than seeking to trade on plaintiff's success, a competitor may select a similar mark because of its "intrinsic consumer-desirability." *Id.* (quoting *Cicena, Ltd. v. Columbia Telecomms. Group,* 900 F.2d 1546, 1552 (Fed.Cir.1990)). Thus, in *Sizes Unlimited,* 871 F.Supp. 1558, the court found that evidence that the defendant used the word "Sizes" in the name of its store with knowledge that the plaintiff's store was similarly named "does not necessarily support a finding that defendant improperly intended to plagiarize plaintiff's [ ] mark and obtain its goodwill for itself, or that the mark had secondary meaning." *Id.* at 1566. This was particularly so, the court noted, "in the absence of some greater indication of recognition of the mark at issue in the minds of the consuming public ... than is present in this case...." *Id.* at 1566; *see also ITC Ltd. v. Punchgini, Inc.,* 373 F.Supp.2d 275, 291 (S.D.N.Y.2005) ("Although there may be some circumstances in which intentional copying is sufficient to show 'secondary meaning,' it would be tautological to conclude that copying alone demonstrates 'secondary meaning' ... where that copying is only prohibited ... if the mark has 'secondary meaning.'"); *see also Ergotron,* 1996 WL 143903, at *9 ("Evidence of copy-

ing is irrelevant if the trademark is not protectable.").

In determining whether a mark had been copied in an effort to take advantage of the owner's consumer recognition, some courts have conducted a visual comparison of the physical attributes of the two marks at issue. *See Kangadis,* 378 F.Supp.2d at 169 ("vastly different labels" on plaintiff's and defendant's products "preclude[d] an inference of plagiarism."). In this case, a comparison of plaintiff's and defendant's "Kosher Yellow Pages" marks, however, reveals obvious differences that suggest a lack of imitative intent.[48]

To be sure, plaintiff has proffered evidence that, if credited, suggests that defendants tampered with evidence to make it appear that they were the first users of the mark and made fraudulent statements to the PTO in applying to register "The Kosher Yellow Pages" mark. (6/21/04 Letter to the Court from Darren Oved; Ben Hooren Opp. Decl. ¶¶ 38, 39, 42–46.) From such evidence one could infer that defendants intentionally copied plaintiff's mark in order to obtain its goodwill for itself. *See generally Centaur Commc'ns,* 830 F.2d at 1224, 1228. Proof of such plagiarism would in turn be some support for a finding of secondary meaning. *See*

*id.* at 1224. Therefore, this factor weighs in plaintiff's favor.

### g. Balancing the Factors

On the record before it, this Court concludes that plaintiff has failed to provide sufficient evidence to allow a reasonable trier of fact to find that the "Kosher Yellow Pages" mark had acquired secondary meaning before DAG commenced its competing use of the mark in 2003. Given the absence of any consumer or advertiser surveys, the inconclusive nature of the proof of plaintiff's advertising efforts, plaintiff's uncertain sales success, the paucity of unsolicited media coverage, and the relatively short time period of exclusive use of the mark—three years and thus only three issues of the directory—plaintiff cannot satisfy its burden, despite its proof of intentional copying. Simply put, on this record, no reasonable trier of fact could find that the relevant segment of the public— whether advertisers or consumers—came to associate "Kosher Yellow Pages" with plaintiff. *Compare Murphy,* 923 F.2d at 928 (affirming district court's grant of summary judgment dismissing infringement claim; court found that mark lacked secondary meaning, where no consumer

---

**48.** The 2000–2001 and 2001–2002 editions of plaintiff's "Kosher Yellow Pages" directories mimicked the appearance of its "Sephardic Yellow Pages," with the title set in a stylized font on a single line in upper and lower case. Below the title was a logo consisting of the letters "KYP" in the middle of a white Jewish star outlined in dark grey, with dark grey "wings" extending from either side. (Ben Hooren TRO Decl., Exs. C, D.) In contrast, in defendants' 2003 debut edition of "The Kosher Yellow Pages" directory, the words "Kosher Yellow Pages" appeared in all upper case letters, with "Kosher" on its own line and approximately twice the size of the remaining two words. Inside the "o" in "Kosher" was a picture of a menorah overlapping a Jewish star. Below the title was a black tag

line with white upper case lettering reading "The only kosher directory." (Ben Hooren TRO Decl., Ex. J.) The 2004 edition cover was similar, but displayed "Kosher Yellow Pages" in a larger font and omitted the tag line. (*Id.*)

In 2003, plaintiff changed the appearance of its directory, printing the words "Kosher Yellow Pages" in a standard Times New Roman font. Plaintiff changed the look yet again in 2004, ironically making it look more similar to defendant's 2003 directory, printing the words "Kosher Yellow Pages" in all upper case letters, with the word "Kosher" on its own line and approximately one-third larger than the other two words. Both the 2003 and 2004 editions retained the "KYP" logo beneath the title. (*See* Ben Hooren Opp. Decl., Ex. 2.)

studies had been undertaken, no unsolicited media coverage had occurred, there was no evidence of expenditures that were related solely to the advertisement of the mark at issue, and the mark had been used for an insufficient period of time—four months—to become associated in the minds of the public with plaintiff); and *Grupke*, 921 F.Supp. at 996 (granting summary judgment dismissing infringement claim where plaintiff, a designer of t-shirts with the phrase "Cats Coming and Going," failed to meet "rigorous evidentiary requirements" necessary to establish secondary meaning, despite evidence of ten-year use of the mark, advertising expenditures of over $1 million in five-year period, sales of 105,000 shirts in four-year period, and four letters from customers who associated the mark with plaintiff), *with GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 294 (S.D.N.Y.2002) (secondary meaning established where plaintiff showed that it "spent in excess of $8 million to advertise [its mark,]" received "widespread unsolicited media coverage of [its] mark," "achieved widespread public exposure through its affiliation with prominent celebrities," and "consistent[ly] used [the mark] as a designation of source."); *Henegan Constr. Co. v. Heneghan Contracting Corp.*, No. 00 Civ.9077, 2002 WL 1300252, at *5 (S.D.N.Y. June 12, 2002) (secondary meaning established where "plaintiff ha[d] used its mark in this industry for over 40 years with apparent exclusivity and, in this time, ha[d] attained enormous sales success, a number of prestigious awards for its services and a very large amount of unsolicited media coverage and letters of commendation relative to its industry."); *Multi–Local Media Corp. v. 800 Yellow Book Inc.*, 813 F.Supp. 199, 203 (E.D.N.Y. 1993) (there was "no question" that "Yellow Book" had acquired secondary meaning in plaintiffs' trading areas, where plaintiffs enjoyed exclusive use of the name on their telephone directory for 50 years, expended "enormous" sums on advertising, produced extensive consumer studies linking the "Yellow Book" mark to plaintiffs as its source, demonstrated unsolicited media coverage of their promotional efforts and their product, and had sales of almost $45 million per year).

## *CONCLUSION*

For the foregoing reasons, it is the recommendation of this Court that defendants' motion for partial summary judgment be granted and that plaintiff's first claim be dismissed.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Raymond J. Dearie on or before *September 11, 2006*. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

**SO ORDERED.**

Aug. 31, 2006.